STATE OF NORTH CAROLINA v. JAMES TYRONE WOODSON AND
LUBY WAXTON

No. 127

(Filed 26 June 1975)

1. Homicide §§ 2, 4— murder in perpetration of robbery — guilt of all
   conspirators
       When a murder is committed in the perpetration or attempt to
   perpetrate any robbery, burglary, or other felony, G.S. 14-17 declares
   it murder in the first degree, and in those instances the law presumes
   premeditation and deliberation and the State is not put to further
   proof of either; furthermore, when a conspiracy is formed to commit
   a robbery or burglary, and a murder is committed by any one of the
   conspirators in the attempted perpetration of the crime, each and all
   of the conspirators are guilty of murder in the first degree.

2. Conspiracy § 5— competency of co-conspirator to testify
       A co-conspirator is an accomplice and is always a competent wit-
   ness, assuming of course he is *compos mentis.*

3. Conspiracy § 5— co-conspirator's testimony — effect of plea bargain
   on competency
       A witness who is otherwise competent to testify is not rendered
   incompetent by the fact that he has a promise of immunity or lenience
   for himself; therefore, the trial court correctly held that two witnesses
   were competent and that their status as co-conspirators testifying for
   the State bore upon the weight and credibility of their testimony and
   not upon its competency.

4. Constitutional Law § 36; Homicide § 31— first degree murder — death
   sentence constitutional
       Imposition of the death penalty in a first degree murder case
   did not violate the Eighth and Fourteenth Amendments of the U. S.
   Constitution or the N. C. Constitution, Art. I, §§ 19, 27.

5. Criminal Law § 22— exemption from prosecution in exchange for testi-
   mony
       On the ground of public policy, it has been uniformly held that a
   state may contract with a criminal for his exemption from prosecution
   if he shall honestly and fairly make a full disclosure of the crime,
   whether the party testified against is convicted or not.

6. Constitutional Law § 30; Criminal Law § 23; Solicitors— authority of
   solicitor to plea bargain — constitutionality of agreement.
       In this State the Solicitor is a constitutional officer authorized and
   empowered to represent the State, and he had full authority to make
   an agreement with two of the four conspirators to an armed robbery
   and a murder to accept pleas of guilty to lesser offenses than armed
   robbery and first degree murder in exchange for their testimony
   against their co-conspirators who were charged with armed robbery
   and first degree murder; furthermore, the agreement violated neither

State v. Woodson

the Fourteenth Amendment rights of the co-conspirators with whom the agreement was not made nor their rights under N. C. Constitution, Art. I, §§ 19, 27.

7. **Constitutional Law § 30; Criminal Law § 23— four conspirators — plea bargain with two — constitutionality**

　　Appellants' contention that the solicitor's selection of two out of four conspirators with whom to plea bargain was arbitrary and denied them equal protection of the laws is untenable, the evidence being that all four were of the same race; that one of the two with whom an agreement was not made planned and directed the robbery and fired the shot which killed the victim and wounded a third person; that the other at no time tendered any plea but contended he was innocent because he had acted under duress from the other appellant; that both appellants were adults while the two conspirators who testified for the State were teen-agers, one being the younger, impressionable brother of the appellant who had planned the robbery.

　　Justice EXUM concurring.

APPEAL by defendants under G.S. 7A-27(a) from *McKinnon, J.*, 2 December 1974 Special Session of the Superior Court of HARNETT.

At the 24 June 1974 Session, in separate bills, defendants, James Tyrone Woodson, aged 23, and Luby Waxton, aged 24, along with Leonard Maurice Tucker, aged 19, and Johnnie Lee Carroll, aged 18, were indicted under G.S. 15-144 for the murder of Mrs. Shirley Whittington Butler on 3 June 1974. At the same time they were also indicted for the armed robbery of Mrs. Butler on 3 June 1974 and for conspiracy to commit armed robbery. In addition, defendant Waxton was indicted for feloniously assaulting Mr. R. N. Stancil on 3 June 1974 with a .22 caliber pistol with the intent to kill him, thereby inflicting upon him serious injuries, not resulting in death.

At the 2 December 1974 Criminal Session, in exchange for their testimony as State's witnesses against Waxton and Woodson, the solicitor for the State dismissed the armed robbery charge against Carroll and the first-degree murder charges against both Tucker and Carroll. Tucker was permitted to plead guilty to the armed robbery of Mrs. Butler and as an accessory after the fact to her murder. Carroll, who is a half-brother of defendant Waxton, was permitted to plead guilty as an accessory after the fact to both the murder and armed robbery of Mrs. Butler.

At the trial, the State's first witnesses were several police officers, whose testimony tended to show:

About 10:30 p.m. on 3 June 1974, a police officer of the City of Dunn entered the E-Z Shop on Fairground Road and found the body of Mrs. Butler, an employee of the shop, lying behind the cash register. She had been shot through the head at close range. The cash drawer had been removed from the register. Lying on the counter were a pack of Kool cigarettes, a dollar bill, a pack of matches, and a box of Cracker-Jacks. In due course, these items were collected and sent to the S.B.I., and Tucker's fingerprints were found on the pack of Kools.

Shortly after the discovery of Mrs. Butler's body police headquarters received a call from Mr. Stancil, who lived just across the street from the E-Z Shop. He reported he had been shot and requested help. The detective who went to his assistance found him bleeding badly and immediately took him to the hospital.

Mr. Stancil testified that at about 10:15 p.m. he went to the E-Z Shop and, as he entered, he noticed that Mrs. Butler was not in her usual place. A person, who was leaving in a hurry, said to him something which sounded like, "look out." Almost simultaneously Stancil heard an explosion and felt pain in his back. He started toward the back of the store but, observing that blood was spurting from his arm, he went home to call for help. A bullet had entered his back, just to the left of his spine, and lodged in his arm. Mr. Stancil never saw Mrs. Butler, and he could not identify the person he saw leaving the shop.

George Willie Carroll (George Willie), the brother of Johnnie Lee Carroll (Carroll) and half-brother of Waxton, testified that about 8:30 p.m. on 3 June 1974 he lent his car to his brothers; that about 10:35 p.m. they had not returned it, and he went to the police station and "reported he wanted his car located." Later that night, George Willie, accompanied by Waxton, Carroll, and Tyrone Woodson, returned to the police station and reported that "the boys" had brought his car back.

Detective Mohiser testified that at 6:00 a.m. the next morning, June 4th, he went to the home of Waxton's mother and requested Waxton to accompany him to the police station. Waxton did so, and after 20-30 minutes Mohiser returned him to his mother's. Immediately thereafter Waxton (so he testified later) arranged with a friend to take him and defendant Wood-

---

---

son to the Fayetteville airport, where they enplaned for Newark, N. J. There they remained until June 14th when Detective Mohiser returned them to Dunn.

On 16 June 1974 at 3:50 p.m., Woodson gave Detective Mohiser the first statement he obtained from any of the four. In it he implicated himself, Waxton, Tucker, and Carroll in the robbery and killing. On the basis of the information he furnished, Carroll and Tucker were arrested. At 7:30 p.m. on June 16th, Tucker signed a confession which implicated Woodson, Waxton, and Carroll. On June 27th Carroll gave the officers a statement, but it was not reduced to writing and signed.

Prior to the time Tucker and Carroll were called as witnesses for the State, counsel for defendants objected to their competency as witnesses on the grounds that they had been indicted with Waxton and Woodson as co-conspirators and principals for the murder and robbery of Mrs. Butler and, if convicted, all would have been subject to the same punishment; that, as a result of "negotiations and plea bargaining" with the solicitor for the State, on 2 December 1974, Tucker and Carroll had been permitted to plead guilty to lesser offenses; that in consequence they were "prejudicial witnesses against Waxton and Woodson," and to permit them "to testify in an attempt to place the blame for the incident" on defendants infringes upon defendants' right to a fair trial; and that, after permitting Tucker and Carroll to plead guilty to lesser crimes, the solicitor's election to put Woodson and Waxton on trial upon a charge for which the mandatory punishment upon conviction is death "is unjust, constitutes an unequal application of the laws of the State and denies them the equal protection of the laws as guaranteed by both the State and federal constitutions."

The court, "being of the opinion that the matters raised go to the weight and credibility of the witnesses and not to their competency to testify," overruled the objections to the competency of Tucker and Carroll as witnesses and permitted them to testify.

Tucker's testimony, summarized except when quoted, is briefed below:

He entered pleas of guilty to the armed robbery of Mrs. Butler and to being an accessory after the fact to her murder in an attempt to save himself, knowing that upon these pleas he

could receive sentences totaling 40 years. He first discussed this case with the officers on June 16th, at which time he gave them a statement.

Tucker, a native of New Jersey, came to Dunn on 13 May 1974 and stayed around "without any income, drinking wine, and smoking marijuana." He became acquainted with Waxton and Woodson about two weeks after his arrival in Harnett County. On June 3rd he and Woodson spent a good part of the day drinking wine for which Woodson had paid.

About 9:30 p.m. Waxton came to Tucker's trailer. He inquired for Woodson, who was not there, and told Tucker to follow him. In about three minutes Tucker walked toward Woodson's trailer, which was about a block away. As he approached the trailer, he saw Waxton hit Woodson in the face with his hand and heard him advise Woodson that if he didn't join the group either Tucker or Waxton would kill him. Woodson had previously told Tucker that he did not plan to take any part in the robbery. The three men then proceeded to Waxton's trailer, where Carroll gave Woodson a towel to put over his eye. Waxton got a nickel-plated Derringer pistol from a cabinet and put it in his pocket. Tucker took Waxton's .22 automatic rifle from the couch and handed it to Woodson. Waxton and Tucker then got in the back seat of an automobile which belonged to Carroll's brother, George Willie. Woodson laid the gun down in the front seat of the car and got in beside Carroll, who drove the car away.

Waxton announced that they were going to rob the E-Z Shop. A week earlier he had told Woodson and Tucker he was going to rob a place. As Carroll drove by, they saw a customer entering the shop; so Carroll drove a short distance down the road and stopped. Waxton was giving all the orders and he directed Woodson to test-fire the rifle by shooting it into the ground. After he had done so the group then drove back to the E-Z Shop and parked. Up until then, the plan had been that Woodson would accompany Waxton into the store, but at "the last minute" Waxton changed his mind and gave Woodson the duty to cover the front door. He told Tucker to go into the store with him and instructed Woodson to stay outside "and don't let nobody in."

As the two walked to the store Waxton told Tucker to ask for a pack of cigarettes. In the store they saw Mrs. Butler

State v. Woodson

behind the counter, and Tucker asked her for a pack of Kools, which she handed to him. Tucker paid for the cigarettes and moved down to the right of the counter. Waxton then asked for a pack of Kools. As Mrs. Butler handed it to him, he procured the Derringer from his back pocket and fired one shot into the left side of her head. She fell to the floor and Waxton jumped over the counter, took the money tray out of the open cash register, and put it on the counter. Tucker picked up the tray and started to the door. When he reached the door he met Mr. Stancil coming in. He told Stancil "to look out" and continued toward the car. Outside, Tucker heard a second shot from inside the store. He got into the car and Waxton "came out of the store walking fast with some paper money in his hand." The four then went to the home of Waxton's mother. There he and Tucker went into the bathroom and counted the money, about $280.00, which Waxton kept.

From the home of Waxton's mother, the four went downtown to the Shaft Inn. George Willie was there and Carroll went with his brother to the police station. Upon their return to the Inn, Carroll took the others back to Waxton's trailer.

Carroll's testimony, summarized except when quoted, tended to show:

He has lived in Dunn all his life. In June 1974 he was unemployed and living with his mother. Prior to June 3rd he had known Tucker three or four days and Woodson about six months. His half-brother, Waxton, at age 18, left North Carolina and went to New Jersey. Waxton returned to North Carolina in 1974 and thereafter Carroll saw him almost daily. Waxton showed him some of the karate "moves" he had learned in New Jersey. On June 3rd he and Waxton borrowed the automobile belonging to their brother George Willie, who lent it to Waxton "for about 10-15 minutes." About 9:00 p.m. Carroll drove the car to Waxton's trailer. As he approached it, he saw Waxton coming across the field with Woodson and Tucker walking behind him. At the trailer Woodson told him that Waxton had punched him in the eye because he had been drinking, and Carroll gave him a towel to cover the eye.

Soon thereafter Woodson took a rifle from Tucker and got in the front seat with the rifle in his hand. Both Woodson and Tucker went willingly and did whatever they did willingly. He himself participated in the crime on his own. Waxton did not

make him. Carroll drove the car past the E-Z Shop and stopped on a dirt road, where Woodson got out and fired the rifle into the ground twice. The four then drove back to the E-Z Shop. Carroll parked the car and Waxton told Tucker to go into the store with him. They got out of the car leaving Woodson and Carroll sitting in the front seat. Woodson was the first to see Mr. Stancil come across the street. He got out of the car with the rifle but Carroll pulled him back and told him to put the rifle down. Mr. Stancil went into the store as Tucker was coming out with a cash register money tray in his hand. Prior to that, Carroll had heard one shot fired. After Tucker came out and the man went in, he heard one more shot. By the time Tucker got to the car, Waxton came out running with some dollar bills in his hand. He said, "let's go," and Carroll drove the car back to his mother's house.

Back at home Carroll took the rifle from the car and put it in the pantry. He and Woodson sat in the living room while Tucker and Waxton went into the bathroom. About ten minutes thereafter the four went downtown, where they met George Willie. He and Waxton "walked to the police station and got it straight about the car." Carroll then took Waxton, Woodson, and Tucker to Waxton's trailer. Carroll next saw Waxton about 4:00 a.m. on June 4th when he and Woodson came to his mother's house. Waxton told Carroll to get rid of the cash tray, which he had put in the pantry, and Carroll buried it beneath his mother's house. That morning he went with Waxton and Woodson to Fayetteville when Jethro Wynn took them to the airport. Carroll received none of the money from the robbery.

Carroll saw Waxton and Woodson when they were brought back to North Carolina on June 14th, and he himself was arrested on June 16th. On June 4th he had talked to Chief Cobb and had denied that Waxton had anything to do with this case. What he told Chief Cobb on that date was untrue. On June 16th he didn't say anything. On June 27th he made a statement to Chief Cobb after being advised of his constitutional rights.

On cross-examination Carroll testified, "I made a trade to save my own life. I am not trying to put anything on Luby [Waxton]; I'm just telling what happened. I agreed to come up here and testify in order to save my own neck."

Chief Cobb's testimony tended to show that the statement which Carroll gave him on June 27th was in substantial accord

with his testimony; that as a result of the information Carroll gave him, he found the money tray buried under his mother's house where he had said it was; that Carroll told him all previous statements were untrue; that he had made no notes on June 27th of the questions he asked Carroll and the answers which he gave, and Carroll signed no statement; that he had tried unsuccessfully to locate the pistol which killed Mrs. Butler.

At the close of the State's evidence defendants moved (1) to dismiss the charges against them because Tucker and Carroll had given certain testimony which did not appear in the "summary of 'Statement of State's Witnesses' " which the solicitor furnished counsel prior to trial; and (2) "if not dismissed then, in any event, a juror be withdrawn and a new trial ordered." The Court denied these motions.

On the ground that the following items were not contained in the summary defendant Woodson then specifically moved to strike the statements (1) "that Woodson took the gun from Tucker" at Waxton's trailer; (2) "that Woodson got out of the car and test-fired the rifle by shooting it twice on the ground" before the group stopped at the E-Z Shop; (3) "that Woodson had a gun before, during, at and after the robbery while they were in the car"; and (4) that Woodson with the gun attempted to get out of the car to stop Stancil." This motion was also denied.

During the course of the arguments on these motions the solicitor told the court "for the record that Mr. McCormick (Woodson's attorney) and [he] had had several pleading negotiation sessions" and that it was his impression that Woodson would enter a plea on Monday morning along with Tucker and Carroll. Whereupon Mr. McCormick informed the court that he had never stated to the solicitor that his client would plead guilty; that he told him he "would make certain recommendations to his client" Woodson, but he had "consistently told the solicitor that Woodson says that he was not guilty." The solicitor's response was that although Mr. McCormick did not offer him a plea but, as a result of their discussions, it was "his impression" that Woodson would enter pleas in his cases just as Tucker and Carroll had done.

At the conclusion of the foregoing discussion, defendant Waxton, through his attorney, Mr. Johnson, requested the court's permission to make a motion in camera. Whereupon, in

the absence of the jury, and in the presence of only Judge McKinnon, defendant Woodson and his attorney, Mr. McCormick, Mr. Glen Johnson, the solicitor, the court reporter, and a deputy sheriff, defendant Waxton tendered to the State "a plea of guilty to being an accessory after the fact of murder and guilty of armed robbery, the same crimes to which Tucker had pled guilty." Mr. Johnson explained to the judge and the solicitor that Waxton had said to him "that he thought he was entitled to the same treatment that Tucker had received and he wanted to do the same thing Tucker had done." Whereupon the court inquired of the soilicitor, "What is your position on that?" and the solicitor answered, "I cannot accept the pleas."

Each defendant testified in his own behalf and offered no other evidence. Waxton's testimony, summarized except when quoted, tended to show:

Waxton, a native of North Carolina, after living nine years in New Jersey, returned to Dunn in November 1973. Woodson, whom he had known for eight years in New Jersey, came with him, and the two lived together in a mobile home park. Waxton met Tucker, also a resident of the park, about two weeks prior to 3 June 1974. Having "talked about it and planned it in advance," Waxton, Woodson, Carroll, and Tucker had agreed to rob the E-Z Shop that night, Woodson and Carroll were unemployed. "They said they wanted money; so they were going to pull a job. I said, 'Why not'?"

About 9:00 p.m. on June 3rd, Waxton went looking for Woodson because Woodson "knew we was going to rob the E-Z Shop." He found him at the trailer of his girl friend. Woodson had been drinking, but he was not drunk. An argument ensued. "He said something to disrespect me and I said something to disrespect him; so I hit him." Waxton then left without having mentioned the robbery to Woodson. Woodson followed behind him and, when they got to Waxton's trailer, Carroll was there in George Willie's car. Waxton owned a 1973 Pontiac and a 1963 Volkswagen, but they used George Willie's car in the robbery. Tucker came over from another trailer and inquired if everybody was ready to go. Everybody said YES, and the four left in George Willie's car with Carroll driving. Woodson had Waxton's rifle, which Waxton had said he bought "to kill snakes."

They then drove by the E-Z Shop, which was only about a mile from Waxton's trailer, and went on a dirt road where

Woodson insisted on testing the rifle to "make sure it would fire." After he had fired it twice, they proceeded to the E-Z Shop. Woodson and Carroll remained in the car while Waxton and Tucker went inside.

Waxton's version of what happened inside is as follows: "I was about to ask for a package of Kool cigarettes but before I spoke, Tucker asked for a package of cigarettes. After she gave him the cigarettes he shot her. I then jumped over the counter and started getting the money out of the cash register. I got a handful of money and then got afraid so I started running out. As I ran out I met Mr. Stancil and I called Tucker and told him, 'let's go, somebody is coming.' After I got a short distance from the car I heard another shot. I didn't have any gun or weapon at any time there in the store and I didn't have any gun or weapon after I came out of the store. When I heard the second shot Leonard [Tucker] was coming out and we both got in the car. We were not at the Food Store more than five minutes."

From the E-Z Shop the four went to the home of Waxton's mother, where he counted the money in the bathroom. There was $325.00 and he divided it equally. Tucker handed the gun, a nickel-plated Derringer he had obtained overseas, to Waxton's mother and asked her to keep it for him. Later Tucker changed his mind and took the gun with him when they left to go downtown. There they saw George Willie, who told them he thought they had pulled a robbery. When they denied the accusation, he asked them to accompany him to the police station. They went and George Willie told the police he had found his car. The next morning, after Detective Mohiser had talked to him, Waxton and Woodson took a plane to New Jersey, where they stayed until Mohiser brought them back to North Carolina. After he and Woodson had been in the Dunn jail for "a while," Waxton asked Mohiser to bring Woodson over and let him tell the detective "who did the shooting." Mohiser complied with the request and "brought Woodson across the hall to him" and asked Woodson who did the shooting. Woodson said Tucker had done it.

Waxton testified that he told the officers Tucker shot the lady but Mohiser told him he "was telling something that was not true"; that the officers never gave him an opportunity to make a statement before he took the stand; that they only listened to what Tucker, Woodson, and Carroll had to say.

Woodson's testimony, summarized except when quoted, tended to show: He and Waxton were good friends. In November 1973 Waxton had brought him to North Carolina to help him escape the drug habit which he had acquired in New Jersey. At first he had lived with Waxton or his mother and George Willie had gotten him a job. On June 3rd Woodson was living with his girl friend. From time to time Waxton reminded Woodson of what he had done for him.

Waxton had "mentioned" the robbery to Woodson on the morning of June 2nd, but he "never agreed to go along." Woodson and Tucker spent most of the day on June 3rd drinking wine which had been purchased with money Woodson's girl friend had given him. He and Tucker had agreed that they would not be in any robbery. That evening when Waxton found Woodson at his girl friend's trailer, Waxton cursed him and told him he was drunk. When he told Waxton it made no difference because he was not going anywhere, Waxton hit him in the eye and said, "If I don't kill you Tucker will. Come on; let's go!"

Woodson was "pretty high" but he wasn't drunk. He knew what he was doing. He decided to go with Waxton and followed him to his trailer. There Tucker handed him Waxton's rifle, and he got in the car with it of his "own free will." He knew there was going to be a robbery, and he knew Waxton had the Derringer. No one forced him to go. He does not recall testing the gun. On the way to the E-Z Shop was the first time Waxton told him "to watch the front door and not let anybody in." He might have gone in with Waxton if he had asked him. Woodson, however, "was laying back with the towel over his eye, the rifle by his side." When he heard the first shot from inside the store, he jumped up and saw Tucker coming out the door and Mr. Stancil going in, but he made no move to stop him. Then he heard a second shot. Tucker was outside the building and almost immediately Woodson saw Waxton emerging with paper money in his hand.

From the E-Z Shop the four went to the home of Waxton's mother. Waxton handed his .22 Derringer with the nickel-plated, pearl handle to his mother. He and Tucker had the money. They went into the bathroom and closed the door, but "there was no division of the money . . . at that time." After going downtown and seeing George Willie, Woodson and Waxton returned to the home of Waxton's mother. There Woodson "started to mention about him shooting the woman," but *the woman* was the last

State v. Woodson

word he got out of his mouth before Waxton hit him in the other eye and staggered him. "He told me never in my life to mention that woman's name again, ever."

The next morning, after Waxton returned from the police station, he told Woodson "to get a few pieces" (clothes) ; that they were going to New Jersey. Jethro Wynn took them to the airport and Carroll went along. At the airport Waxton gave Woodson money from the robbery with which to buy his ticket and then balled up the rest of the money and told him "to hold it." In New Jersey, at the home of Waxton's mother-in-law, he "gave back all the money" to Waxton. When Woodson was later picked up, he returned to North Carolina voluntarily.

Later, in the Dunn jail, Woodson heard Waxton "when he was hollering about making a confession—he wanted to speak to Mohiser." The detective took him over "in front of Waxton," who told Mohiser he knew who shot the woman and that he would tell him where the pistol was if he would pick Tucker up and lock him up. Woodson did not make any statement at that time because he "had already made [his] signed statement." He heard Waxton tell Mohiser "that he did not do the shooting; that it was Leonard Tucker."

As to Woodson the jury returned verdicts of "Guilty of Murder in the First Degree as charged," and "Guilty of Armed Robbery as charged." Upon these verdicts the charge of armed robbery having been merged in the charge of first-degree murder, the court imposed only the mandatory sentence of death.

As to Waxton the verdicts were "Guilty of Murder in the First Degree as charged," "Guilty of Armed Robbery as charged," and "Guilty of Assault with a Deadly Weapon with Intent to Kill Inflicting Serious Injury as charged." Upon the charge of felonious assault the court adjudged that Waxton be imprisoned for twenty years. Upon the murder and robbery convictions, the robbery charge having been merged in the charge of first-degree murder, the court imposed the mandatory sentence of death.

Each defendant appealed from the sentence of death directly to this Court under G.S. 7A-27 (a), and, upon Waxton's motion, we certified his appeal from the sentence imposed upon his conviction of felonious assault for initial appellate review by this Court under G.S. 7A-31 (a).

*Rufus L. Edmisten, Attorney General and James E. Magner, Jr., Assistant Attorney General, for the State.*

*Edward H. McCormick for James Tyrone Woodson, defendant appellant.*

*W. A. Johnson for Luby Waxton, defendant appellant.*

SHARP, Chief Justice.

Patently, defendants' motion to dismiss the charges against them and their contentions that because certain items of evidence were omitted from the summaries furnished them by the solicitor are without merit and require no discussion. Each defendant went upon the stand and voluntarily testified to facts which make him guilty of murder in the first degree. As counsel concede, the only significant difference in their testimony relates to who fired the shot which killed Mrs. Butler during the robbery of the E-Z Shop; and, since each admitted he was one of the four who conspired to rob the shop, legally it makes no difference whether Waxton or Tucker fired the shot.

[1] "When a murder is 'committed in the perpetration or attempt to perpetrate any . . . robbery, burglary or other felony,'' G.S. 14-17 declares it murder in the first degree. In those instances the law presumes premeditation and deliberation, and the State is not put to further proof of either. . . . Furthermore, when a conspiracy is formed to commit a robbery or burglary, and a murder is committed by any one of the conspirators in the attempted perpetration of the crime, each and all of the conspirators are guilty of murder in the first degree." (Citations omitted.) *State v. Fox*, 277 N.C. 1, 17, 175 S.E. 2d 561, 571 (1970).

[2] Had the testimony of Tucker and Carroll been incompetent, the testimony of defendants themselves would stymie their contention that its admission constituted prejudicial error. However, the testimony of their co-conspirators was competent. "A co-conspirator is an accomplice, and is always a competent witness; assuming of course he is *compos mentis.*" *State v. Goldberg*, 261 N.C. 181, 202, 134 S.E. 2d 334, 348 (1964). "It is obvious . . . that in practically every case where an accomplice testifies as a witness for the prosecution, he is induced to do so by a promise, or at least by a hope and expectation, of immunity or leniency for himself, and that. the rule which makes an

accomplice a competent witness would be of little benefit if he were made incompetent by the mere fact that he had received such a promise.

[3] "In accordance with this view, the courts, both English and American, have held with substantial unanimity that a witness who is otherwise competent to testify is not rendered incompetent by the fact that he has a promise of immunity or lenience for himself." Annot., 120 A.L.R. 742, 751 (1938); *see State v. Watson,* 283 N.C. 383, 196 S.E. 2d 212 (1973); annot., 24 L.R.A. (N.S.) 442-443 (1910).

As Justice Barnhill (later Chief Justice) said in *State v. Roberson,* 215 N.C. 784, 787, 3 S.E. 2d 277, 279 (1939), "It bears against the credibility of a witness that he is an accomplice in the crime charged and testifies for the prosecution; and the pendency of an indictment against the witness indicates indirectly a similar possibility of his currying favor by testifying for the State; so, too, the existence of a promise or just expectation of pardon for his share as accomplice in the crime charged. 2 Wigmore on Evidence, 2d Ed., 350." *See* 1 N.C. Evidence § 45 (Brandis Rev. 1973).

Judge McKinnon correctly held that Tucker and Carroll were competent witnesses and that their status as co-conspirators testifying for the State bore upon the weight and credibility of their testimony and not upon its competency.

[4] G.S. 14-17, as rewritten on 8 April 1974 by the enactment of N. C. Sess. Laws, ch. 1201, § 1 provides that murder in the first degree "shall be punished with death." Defendants contend, however, that capital punishment "under the laws of North Carolina [would] violate U. S. Const. amend. VIII and amend. XIV, § 1, and N. C. Const. art. 1, §§ 19, 27." In the last three years this Court has several times rejected these contentions. They have been thoroughly considered and further discussion would be merely repetitious. *See State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973); *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974); *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974); *State v. Avery,* 286 N.C. 459, 212 S.E. 2d 142 (1975).

Albeit three members of the Court dissented as to the death penalty in each of the foregoing cases and voted to remand for the imposition of a sentence of life imprisonment; the dissents were not based upon the premise that the death

sentence constituted cruel and unusual punishment or that there were any constitutional infirmities in capital punishment per se. On the contrary, the thesis of the dissents was (1) that the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972), decided 29 June 1972, had invalidated the death penalty provisions of G.S. 14-17 (and also G.S. 14-21, G.S. 14-52, and G.S. 14-58), enacted in 1949; and (2) that until the statutes which made death the punishment for first-degree murder, first-degree burglary, rape, and arson were rewritten or amended by the General Assembly, this Court could not reinstate capital punishment.

On 8 April 1974 the General Assembly rewrote G.S. 14-17 and G.S. 14-21 to provide the death sentence for first-degree murder and first-degree rape. At the same time it rewrote G.S. 14-52 and G.S. 14-58 to provide life imprisonment for burglarly in the first degree and arson. As to first-degree murders and first-degree rapes committed *after* 8 April 1974, by its rewrite of G.S. 14-17 and G.S. 14-21, the General Assembly eliminated the grounds upon which three members of the Court had dissented to the imposition of the death sentence for such crimes committed prior to that date. The felony-murder for which Waxton and Woodson have been convicted was committed on 3 June 1974—56 days after the legislature redeclared the public policy of this State with reference to capital punishment. Until changed by the General Assembly, or invalidated by the Supreme Court of the United States, that policy must stand.

Counsel for defendants, although aware of the *Waddell* and *Jarrette* decisions, as well as the subsequent ones based on them, have understandably felt constrained to repeat the constitutional challenge to the death penalty.

Defendants next contend that since Waxton, Woodson, Carroll, and Tucker, the four conspirators, are equally guilty of first-degree murder it would be "fundamentally unfair" to permit two of them to plead guilty to offenses less than capital in exchange for their testimony against the others. Defendant Waxton, who tendered at the close of the evidence the same plea which Tucker tendered prior to the trial, contends that the solicitor's refusal to accept his plea was an arbitrary exercise of power which denied him due process and the equal protection of the laws. Defendant Woodson, who tendered no plea and contended throughout that he was not guilty, argues

---

State v. Woodson

---

that "due process and equal protection" require that he receive no greater punishment than his accomplices could have been given under their pleas.

[5] "From the earliest times, it has been found necessary, for the detection and punishment of crime, for the state to resort to the criminals themselves for testimony with which to convict their confederates in crime. While such a course offers a premium to treachery, and sometimes permits the more guilty to escape, it tends to prevent and break up combinations, by making criminals suspicious of each other, and it often leads to the punishment of guilty persons who would otherwise escape. Therefore, on the ground of public policy, it has been uniformly held that a state may contract with a criminal for his exemption from prosecution if he shall honestly and fairly make a full disclosure of the crime, whether the party testified against is convicted or not. (Citations omitted.)" *Ingram v. Prescott*, 111 Fla. 320, 321-322, 149 So. 369 (1933) ; *Henderson v. State*, 135 Fla. 548, 185 So. 625, 120 A.L.R. 742 (1938). For the history of the "ancient modes of practice" when accomplices "turned State's evidence," see *United States v. Ford*, 99 U.S. 599, 25 L.Ed. 399 (1879) ; 1 Wharton's Criminal Law and Procedure § 165 (1957) ; 22 C.J.S., *Criminal Law* § 46(1) (1961) ; 8 R.C.L., *Criminal Law* § 101 (1915) ; Notes: 18 Am. & Eng. Ann. Cas. 747 (1911) ; 24 L.R.A. (N.S.) 439 *et seq.* (1910).

In many states the prosecuting attorney has no authority, without the court's consent, to make a binding agreement with one charged with a crime that if he will testify against others, he himself shall be exempt from criminal liability or be allowed to plead guilty to a lesser offense. "In states in which a prosecuting attorney may enter a *nolle prosequi* without the consent of the court, he may grant a witness immunity from prosecution by contract without approval of the court." 21 Am. Jur. 2d, *Criminal Law* § 153, *see also* §§ 514-518 (1965) ; 24 L.R.A. (N.S.) 442-443 (1910) ; 18 Am. & Eng. Ann. Cas. 748-749 (1911) ; annot., 85 A.L.R. 1177 (1933). The courts treat such promises as pledges of the public faith and, when made by the public prosecutor, the court will see that the public faith which has been pledged by him is kept. *Camron v. State*, 32 Tex. Crim. 180, 22 S.W. 682, 40 Am. St. R. 763 (1893) ; *see State v. Hingle*, 242 La. 844, 139 So. 2d 205 (1962) ; *State v. Ward*, 112 W.Va. 552, 165 S.E. 803, 85 A.L.R. 1175 (1932) ; *State v. Graham*, 12 Vroom, 15, 32 Am. Rep. 174 (N.J. 1879) ; *United States v.*

*Lee,* Case No. 15,588, 26 F. Cas. 910 (1846) ; *United States v. Woody,* 2 F. 2d 262 (D. Mont. 1924) ; *United States v. Brokaw,* 60 Fed. Supp. 100 (S.D. Ill. 1945) ; Annot., 43 A.L.R. 3d 281 *et seq.* (1972).

[6]   In North Carolina "[t]he Solicitor is a constitutional officer authorized and empowered to represent the State." His announcement prior to the trial that the State would not seek a verdict of guilty of first-degree murder but would ask for a verdict of second-degree murder or manslaughter is tantamount to taking a *nolle prosequi* or an acquittal on the charge of first-degree murder. *State v. Miller,* 272 N.C. 243, 245, 158 S.E. 2d 47, 49 (1967) ; *State v. Rogers,* 273 N.C. 330, 159 S.E. 2d 900 (1968).

As pointed out in *State v. Lyon,* 81 N.C. 600, 603 (1879), the shortest and best mode of carrying out a promise of immunity is for the solicitor to exercise the right vested in him "when, in his judgment, the case calls for it, to enter a *nolle prosequi* and allow the prisoner's discharge, which practically accomplishes the same ends as [a] pardon." The solicitor had full authority to make the agreement which he made with Tucker and Carroll, and we hold that it violated neither the Fourteenth Amendment rights of defendants Waxton and Woodson nor their rights under N. C. Const., art. 1 §§ 19, 27.

As Mr. Justice White said in delivering the opinion of the Court in *Brady v. United States,* 397 U.S. 742, 25 L.Ed. 2d 747, 90 S.Ct. 1463 (1970), "[W]e cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State. . . ." *Id.* at 753, 25 L.Ed. 2d at 759, 90 S.Ct. at 1471. In *Lisenba v. California,* 314 U.S. 219, 227, 86 L.Ed. 166, 175, 62 S.Ct. 280, 285 (1941), Mr. Justice Roberts noted that "the practice of taking into consideration, in sentencing an accomplice, his aid to the State in turning state's evidence can be no denial of due process to a convicted confederate."

In *Newman v. United States,* 382 F. 2d 479 (D.C. Cir. 1967) the sole question presented was whether it was a denial of the appellant's constitutional rights for the United States Attorney to accept a guilty plea tendered by appellant's co-defendant for a lesser offense under the indictment, while refusing to accept the same plea from the appellant. Both were indicted for housebreaking and petty larceny. The co-defendant was allowed to

plead guilty to the misdemeanors of petty larceny and attempted housebreaking; the appellant was tried and convicted of the crimes charged. He contended that the United States Attorney's conduct had denied him due process and equal protection in that both "were equally guilty . . . and to permit one party an avenue of escape with relatively minor punishment while refusing the same procedure to Appellant violates the standard of fairness demanded by the law by the Constitution. . . ." *Id.* at 480.

In rejecting the appellant's contentions Burger, Circuit Judge (now Chief Justice of the United States Supreme Court), pointed out that the United States Attorney is charged with the faithful execution of the laws and prosecution of offenses against the United States, and, as such, he must have broad discretion. "To say that the United States Attorney must literally treat every offense and every offender alike is to delegate him an impossible task; of course, this concept would negate discretion. Myriad factors can enter into the prosecutor's decision. Two persons may have committed what is precisely the same legal offense but the prosecutor is not compelled by law, duty or tradition to treat them the same as to charges. On the contrary, he is expected to exercise discretion and common sense to the end that if, for example, one is a young first offender and the other older, with a criminal record, or one played a lesser and the other a dominant role, one the instigator and the other a follower, the prosecutor can and should take such factors into account; no court has any jurisdiction to inquire into or review his decision." *Id.* at 481-482.

"Mere selectivity in prosecution creates no constitutional problems. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed. 2d 446 (1962). To invoke the defense [denial of equal protection under the Fourteenth Amendment] one must prove that the selection was deliberately based on an unjustifiable standard, such as race, religion, or other arbitrary classification." *United States v. Steele,* 461 F. 2d 1148, 1151 (9th Cir. 1972). *See* Comment, The Right to Nondiscriminatory Enforcement of State Penal Laws, 61 Col. L. Rev. 1103, 1119-1120 (1961).

[7] In this case we perceive no possible constitutional infirmity in the solicitor's selection, no abuse of discretion, and no arbitrary classification. All four of the defendants are black and their religious views are undisclosed. The evidence that Waxton planned and directed the robbery and that he fired the shots

which killed Mrs. Butler and wounded Mr. Stancil is overwhelming. No extenuating circumstances gave the solicitor any incentive to accept the plea he tendered at the close of the State's evidence.

Woodson at no time tendered to the State a plea of any kind. Throughout the trial he contended that he was innocent because he had acted under duress from Waxton. It is not surprising that the jury rejected this defense in view of his testimony that on the night of the robbery he knew what he was doing; that he got into the car of his own free will after having known all day that "there was going to be a robbery"; that he he had not seen Waxton during the day and "he could have gone anywhere if he had desired to do so"; that his staying in the car with the rifle outside the E-Z Shop and Carroll's driving the car "was just as much a part of the plan as was Waxton's and Tucker's going into the store." *See* 21 Am. Jur. 2d, *Criminal Law* § 100 (1965).

We note, however, the learned and painstaking trial judge fully instructed the jury on coercion as an excuse for crime and gave Woodson the full benefit of his contention that he went with the group to rob the E-Z Shop under compulsion from Waxton. The jury were instructed that if Woodson went along and did what he did only because of a well-founded fear of immediate death or great bodily harm at the hands of Waxton he would not be guilty of any crime.

Finally, we note that Waxton and Woodson were adults, aged 24 and 23 respectively; Tucker and Carroll were still in their teens, aged 18 and 19 respectively. Carroll was obviously impressed by Waxton, his older brother who, after an absence of eight years, had returned from New Jersey with a knowledge of karate and much other information he was no doubt willing to impart to a younger brother willing to learn. We find no evidence that the solicitor's selection was deliberately based on an unjustifiable standard.

We have considered the entire record in this case, as well as each defendant's assignments of error, with care commensurate with the gravity of the sentences from which defendants appeal, and in the trial below we find

No error.

State v. Woodson

Justice EXUM concurring:

This is the first case, since my joining the Court, in which we have considered the application of the death sentence pursuant to Chapter 1201, 1973 Session Laws, ratified April 8, 1974, codified as G.S. 14-17, which makes first degree murder committed after April 8, 1974, punishable by death. All capital cases heretofore considered in which I have participated involved crimes committed before April 8, 1974. Death sentences in these cases have been affirmed by a majority of the Court on the authority of *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 18 (1973). I have dissented in each of these cases from that portion of the opinions sustaining the death sentence *not* on the ground that such a sentence was violative of the Cruel and Unusual Punishment Clauses of the Constitutions of the United States and North Carolina, but on the ground that only the Legislature and not this Court had authority to reinstate the death penalty in North Carolina after our State's statutory scheme for imposing it had been invalidated by *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972). See my dissent in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975).

By enactment of Chapter 1201, 1973 Session Laws, effective on April 8, 1974, the North Carolina General Assembly did reinstate the death penalty for the crime of first degree murder and the newly created crime of first degree rape. Consequently, for me, the question of the constitutionality of imposing a sentence of death for conviction of first degree murder duly authorized by legislative enactment is for the first time squarely presented.

It is not an easy question for I am personally opposed to capital punishment. Maintaining it, even for murder, is not in my view wise public policy. I do not believe, however, that its infliction upon one convicted of premeditated murder or murder committed in the course of another felony which itself is inherently dangerous to human life, such as we have here, contravenes the Constitution of the United States or North Carolina.

My belief that capital punishment is unwise as a matter of public policy is based primarily on the proposition that government, if it functions properly, should seek to set an example, to teach the people whom it serves. People ought to be able to look to the basic underlying policies of government and see there

what is inherently right and proper. I agree with Mr. Justice Brandeis who once wrote: "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States,* 277 U.S. 438, 485, 72 L.Ed. 944, 959, 48 S.Ct. 564 (1928). The cold, calculated, premeditated taking of human life is an act the brutality and violence of which is not diminished because it is sponsored by the state. We rightly abhor the kind of human being who commits such an act. That the state should respond in kind is, to me, equally abhorrent. The argument that we somehow exalt human life by executing those wretches who murder and rape falls of its own weight. Calculated killings by individuals without doubt cheapen the God-given right to live. So, however, do calculated executions at the hands of the state. Executions are bad examples; they teach, not respect for life, but that some lives are not worth maintaining. It is a short step in the minds of many from execution at the hands of the state to murder and other violence at the hands of people. As Mr. Justice Stewart wrote in his concurring opinion in *Furman,* 408 U.S. at 306, 33 L.Ed. 2d at 388:

> "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. *And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.*" (Emphasis supplied.)

Neither do I believe that capital punishment, even when regularly utilized, deters generally the commission of capital crimes. Practically all of the statistical data available on the subject has been collected and much of it thoroughly analyzed in Bowers, *Executions in America* (D. C. Heath and Company, 1974) (hereinafter, Bowers). The author concludes:

> "To assess the deterrent effects of capital punishment, investigators have conducted studies of various descriptions— examining and comparing nations and jurisdictions within nations for the affects of abolition and other changes in the status of the death penalty, for the effects of fluctuations in and the cessation of executions, and for the impact of the death sentence and the execution in specific cases. Not one of these studies has turned up evidence that the death penalty is superior as a deterrent to punishments used as alternatives. The data presented in Chapters 5 and

6 specifically restrict claims for the deterrent power of the death penalty by showing that the experimental abolition of capital punishment, the nationwide moratorium on executions, and the move from mandatory to discretionary capital punishment, did not encourage or contribute to a rise in criminal homicide.

"The failure of the death penalty to display any unique deterrent effect has been attributed to the fact that it had come to be imposed almost exclusively for irrational actions and that even for such conduct it was unlikely to be imposed. Murder and rape are typically committed in rage, drunkenness, and/or stupefying passion. The offender acts in madness or out of hatred, because of insult or betrayal, without expecting to be caught, or not caring if he is. While the objective likelihood of being put to death for his crime is quite low, it is doubtful that the capital offender is subjectively aware of his chances of escaping execution. Thus, even under the mandatory death penalty, which presumably contributes to the impression that offenders are certain to be executed if caught, potential offenders appear equally oblivious to such impending doom." *Id.* at 193-94.

Bowers has carefully compared homicide rates for an equal period of time before and after 1967 (the year of the last execution in the United States) in death penalty and contiguous abolition states. These comparisons make a convincing case that neither utilization of capital punishment mandatorily or in a discretionary way nor its *de jure* nor *de facto* abolition has had any appreciable effect on the rate of commission of capital crimes. See also *Furman v. Georgia, supra* at 348-54, 33 L.Ed. 2d at 412-415 (Mr. Justice Marshall concurring).

It must be conceded that the raw data available has shortcomings which reduce its probative value. "One is that there are no accurate figures for capital murders; there are only figures on homicides and they, of course, include non-capital killings." *Id.* at 349-50, 33 L.Ed. 2d at 412-13 (Mr. Justice Marshall concurring). The main shortcoming of the statistical arguments is:

" 'Capital punishment has obviously failed as a deterrent when a murder is committed. We can number its failures. But we cannot number its successes. No one can ever know how many people have refrained from murder because of

State v. Woodson

the fear of being hanged.' This is the nub of the problem. . . ." *Id.* at 347, 33 L. Ed. 2d at 411 (Mr. Justice Marshall concurring).

Deterrence, however, is not the only purpose of sanctions against criminal activity. Retribution has long been recognized by many as another valid purpose. Chief Justice Burger pointed out in his dissent in *Furman,* "The Court has consistently assumed that retribution is a legitimate dimension of the punishment of crimes." 408 U.S. at 394, 33 L.Ed. 2d at 439. I, personally, do not believe that retribution has any legitimate place in our criminal justice system. My view is that the goals of sanctions against criminal conduct should be general deterrence to others, special deterrence to the offender himself, restitution to the victim, and rehabilitation of the offender. Punishment in the sense of retribution, vengeance, or retaliation is always in the long run self-defeating.

> "But the punitive attitude persists. And just so long as the spirit of vengeance has the slightest vestige of respectability, so long as it pervades the public mind and infuses its evil upon the statute books of the law, we will make no headway toward the control of crime. We cannot assess the most appropriate and effective penalty so long as we seek to inflict retaliatory pain." Menninger, *The Crime of Punishment* 218 (The Viking Press 1968).

Many disagree. "[R]esponsible legal thinkers of widely varying persuasions have debated the sociological and philosophical aspects of the retribution question for generations, neither side being able to convince the other." *Furman v. Georgia, supra* at 394-95, 33 L.Ed. 2d at 439 (Chief Justice Burger dissenting). While the extent of retribution available is certainly limited by the Cruel and Unusual Punishment Clauses in our state and federal constitutions, in the case now under consideration exaction of the death penalty in a purely retributive sense, while offensive to me personally, does not contravene these constitutional prohibitions.

The point is that as a judge I cannot substitute my personal will for that of the Legislature merely because I disagree with its chosen policy. The utility of capital punishment as a sanction against first degree murder in our scheme of criminal justice is one upon which reasonable, learned, humane, and conscientious persons differ. These differences are nowhere better

documented than in the nine separate opinions filed by the Chief Justice and Associate Justices of the United States Supreme Court in *Furman* and the various authorities relied on in each of the opinions. Whether the effects of capital punishment in a murder case are, indeed, brutalizing or salutary, whether the data available tending to negate the deterrent effect of capital punishment really outweighs arguments in its favor resting on "logical hypotheses devoid of evidentiary support, but persuasive nonetheless," *Furman v. Georgia, supra* at 347, 33 L.Ed. 2d at 411 (Mr. Justice Marshall concurring), and whether in a murder case it should be permitted for purposes of pure retribution are questions upon which honest persons conscientiously and deeply differ. This aspect of the question strongly militates in favor of judicial deference to the legislative will in the case now before us.

I fervently hope that someday North Carolina will join her ten sister states who have legislatively totally abolished capital punishment and some forty-five civilized countries throughout the world who likewise have abolished it (except, in some instances, in time of martial law and "for certain extraordinary civil offenses"). Bowers at 6, 178. The Constitutions of the United States and North Carolina in my view do not require her to do so in cases such as this one.