STATE OF NORTH CAROLINA v. NORMAN DALE JOHNSON

No. 63

(Filed 4 September 1979)

1. **Criminal Law § 135.4— first degree murder—sentencing hearing—instructions on "impaired capacity" mitigating circumstance**

    2. **Criminal Law § 135.4— capital case—sentencing hearing—lack of history of criminal activity as mitigating circumstance—good character**

    The trial judge's reference in a capital case to a defendant's lack of "significant history of prior criminal activity," G.S. 15A-2000(f)(1), does not encompass defendant's contention regarding the mitigating circumstance of good character, since good character imports more than simply the absence of criminal convictions.

3. **Criminal Law § 135.4— capital case—sentencing hearing—instruction on other mitigating circumstances—request for instructions on particular items**

    In the absence of a timely request by defendant that the court at the sentencing hearing in a capital case instruct on specified "other circumstances" which defendant contends the jury should consider in mitigation, failure of the court to mention any particular item as a possible mitigating factor, including good character, will not be held for error so long as the court instructs that the jury may consider any circumstance which it finds to have mitigating value pursuant to G.S. 15A-2000(f)(9).

4. **Criminal Law § 135.4— capital case—sentencing hearing—submission of written mitigating circumstances—necessity for submitting requested factors supported by evidence**

    If mitigating circumstances in a capital case which are expressly mentioned in G.S. 15A-2000(f) are submitted to the jury in writing, which is the preferred procedure, any other relevant circumstance proffered by the defendant as having mitigating value which is supported by the evidence and which the jury

State v. Johnson

may reasonably deem to have mitigating value must, upon defendant's timely request, also be submitted in writing.

**5. Criminal Law § 135.4— capital case—sentencing hearing—mitigating circumstances—burden and standard of proof—peremptory instruction**

The burden of persuading the jury on the issue of the existence of any mitigating circumstance is upon the defendant, and the standard of proof is by a preponderance of the evidence. Where, however, all of the evidence in the case, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance if he makes a timely request for such an instruction.

**6. Criminal Law § 135.4— capital case—sentencing hearing—impaired capacity mitigating circumstance—no right to peremptory instruction**

Defendant was not entitled to a peremptory instruction on the mitigating circumstance of impaired capacity where a medical expert's testimony would have supported a jury finding that defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired, but the testimony of a lay witness who observed and conversed with defendant around the time of the murder in question would have supported a contrary finding.

**7. Criminal Law § 135.4; Homicide §§ 13, 31.1— first degree murder—plea bargain for sentence of life imprisonment prohibited**

A defendant may not plead guilty to first degree murder and by prearrangement with the State be sentenced to life imprisonment without the intervention of a jury.

**8. Criminal Law § 135.4— capital case—sentencing hearing—authority of State to recommend life imprisonment—effect of evidence of aggravating circumstance**

G.S. 15A-2000 does not permit the State in a capital case to recommend to the jury during the sentencing hearing a sentence of life imprisonment when the State has evidence from which the jury could find at least one aggravating circumstance listed in G.S. 15A-2000(e). However, in a case in which the State has no evidence of an aggravating circumstance, the State may so announce to the court and jury at the sentencing hearing, and the court may proceed to pronounce a sentence of life imprisonment without the intervention of the jury.

**9. Criminal Law § 135.4— first degree murder—sentencing hearing—aggravating circumstance—heinous, atrocious or cruel—instructions**

Upon request by defendant, the trial court, when instructing on the aggravating circumstance of G.S. 15A-2000(e)(9) that the murder was "especially heinous, atrocious, or cruel," should instruct the jury that not every murder is necessarily especially heinous, atrocious or cruel in the sense those words are used in the statute.

10. **Criminal Law § 135.4— first degree murder — sentencing hearing — submission of issue as to whether crime was heinous, atrocious or cruel**

The trial court properly submitted to the jury the aggravating circumstance as to whether the murder in question was "especially heinous, atrocious or cruel" where the evidence tended to show that defendant first tried to strangle his victim to death with a fish stringer; upon rendering her unconscious he sexually molested her; and then, realizing she was not dead, he stabbed her to death.

11. **Criminal Law § 135.4— first degree murder — premeditation and deliberation — rape as aggravating circumstance**

There was no merit in defendant's contention that the State relied on the separate felony of rape as an essential element of the capital offense of first degree murder and also relied on such rape as an aggravating circumstance to support the imposition of the death penalty, since defendant pled guilty to first degree murder and there was evidence of premeditation and deliberation.

12. **Constitutional Law § 40— first degree murder case — indigent defendant — failure to appoint associate counsel**

An indigent defendant was not prejudiced by failure of the court to appoint an associate counsel to assist his counsel in a first degree murder case in which defendant entered a plea of guilty and the crucial trial proceedings centered around the sentencing hearing.

Justice BROCK did not participate in the consideration or decision of this case.

Justice HUSKINS concurring and joins the concurring opinion of Justice CARLTON.

Justice CARLTON concurring.

BEFORE *Judge Collier* at the 20 March 1978 Special Criminal Session of CLEVELAND Superior Court, defendant entered a plea of guilty to first degree murder. He was sentenced to death. He appeals pursuant to G.S. 7A-27(a). This case was docketed and argued as No. 55 at the Fall Term 1978.

*Rufus L. Edmisten, Attorney General, by Donald W. Grimes, Assistant Attorney General, for the state.*

*H. Houston Groome, Jr., Attorney for defendant appellant.*

EXUM, Justice.

This appeal presents a number of questions arising under our death penalty statute, G.S. 15A-2000, *et seq.* Of principal importance is the meaning and application here of the impaired

capacity mitigating circumstance.[1] For error in the trial court's instructions concerning it, defendant is entitled to a new sentencing hearing. Other questions raised and decided relate to (1) procedural requirements for submitting to the jury mitigating circumstances under G.S. 15A-2000(f); (2) the power of the state and defendant to enter into sentence negotiations in a capital case; (3) adequacy of the evidence and the instructions on whether this capital felony was "especially heinous, atrocious, or cruel";[2] and (4) whether the trial court should have appointed an associate counsel.

I

On 20 October 1977 Mabel Bowman Sherrill, the 65-year old wife of Bruce Sherrill, left their home to go to a familiar fishing area on a lake in Caldwell County approximately one mile away. Sometime in the early afternoon of that day she was found near the lake apparently murdered. An investigation ensued involving both the Caldwell County Sheriff's Department and the State Bureau of Investigation.

By 31 October 1977 defendant had become a suspect in the investigation.[3] On that date at approximately 9:00 p.m. defendant was located by Captain Robert Webster and Detective Roger Hutchings, both of the Caldwell County Sheriff's Department, at "The Snack Bar" in Hickory. At their request he agreed to accompany them to Lenoir in Caldwell County. Captain Webster testified that defendant at this point was not under arrest "but he was being detained for questioning regarding the homicide of Mabel Bowman Sherrill."[4]

---

1. Under G.S. 15A-2000(f)(6) the jury, in determining whether to impose the death penalty is to consider as a mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" was impaired.

2. This is an aggravating circumstance to be weighed by the jury in determining whether to impose the death penalty. G.S. 15A-2000(e)(9).

3. What the investigation had revealed to cause defendant to be a suspect at this time does not appear in the record.

4. We are aware of a possible issue arising under *Dunaway v. New York*, --- U.S. ---, 60 L.Ed. 2d 824 (1979). The United States Supreme Court held in *Dunaway* that a custodial detention for purposes of questioning is a Fourth Amendment seizure and must be based on no less than probable cause to make an arrest. Any arrest not based on probable cause is unlawful, and evidence obtained as a result thereof must be suppressed. Whether, in fact, police had probable cause to arrest defendant on 31 October 1977 is a question left unresolved on this record. Defendant does not raise this point on appeal, nor are we, because of the state of the record, in a position to pass on the question *sua sponte*. Defendant did move to suppress all out-of-court statements made to investigators as well as the .38 caliber pistol recovered from his brother. His motion was based entirely on *Miranda* grounds. Judge Collier, after hearing evidence, found that defendant had duly waived his right to remain silent and his right to counsel and denied this motion. Defendant takes no exception

During the ride from Hickory to Lenoir defendant was questioned by Captain Webster regarding various firearms which defendant owned. Defendant admitted owning four firearms, one of which was a .38 caliber Smith & Wesson revolver which defendant said he had recently acquired. Defendant told Captain Webster that he had sold this pistol to his brother, Robert Johnson, who lived in Icard. After Captain Webster and defendant arrived in Lenoir defendant agreed to take Captain Webster and Detective Hutchings to his brother's home. The three went there and retrieved the .38 caliber pistol. This pistol was later identified as being in the possession of the deceased when she left home on 20 October 1977.

After the pistol was retrieved, defendant was returned to the Caldwell County Sheriff's Department where, after questioning, he confessed in the early morning hours of 1 November 1977 to the murder of Mabel Bowman Sherrill. He was immediately charged formally with the murder and ultimately indicted by the Caldwell County Grand Jury during the November, 1977, Session of Caldwell Superior Court. On 2 November 1977 Mr. Houston Groome was appointed counsel for defendant.

In November, 1977, defendant moved in writing for the appointment of an associate counsel, change of venue, and the appointment of an expert medical witness. He also moved to be found lacking in the capacity to proceed and gave notice that his defense would be insanity. In response to these motions Judge Ervin ordered a change of venue to Cleveland County. Judge Ervin also ordered that defendant be medically examined at Dorothea Dix Hospital for the purpose of determining his capacity to proceed and his mental capacity at the time of the alleged offense. In February, 1978, Judge Ervin appointed Dr. Richard J. Proctor, Chairman of the Department of Psychiatry at Bowman Gray School of Medicine, Winston-Salem, for the purpose of examining the defendant "to determine his mental capacity and competence to understand . . . the nature and consequences of his actions and the allegations . . . which gave rise to the charges pending against him and to understand, know and appreciate any

to this ruling on appeal. We have reviewed the findings of the trial court. They are supported by the evidence. Furthermore, defendant, by not excepting to the order denying his motion to suppress and not assigning it as error on appeal, has, in view of his guilty plea, waived his *Miranda* and *Dunaway* objections at least as to the guilt phase of the proceeding.

State v. Johnson

pretrial constitutional rights which he may have . . . and to deter-
mine his ability to assist his counsel in the defense of this case."

Defendant came to trial before Judge Collier. Defendant mov-
ed for a finding that he was incapable of proceeding by reason of
insanity and lack of mental capacity to proceed. At that point,
Judge Collier conducted a hearing, as required by G.S.
15A-1002(b)(3), to determine defendant's capacity to proceed. The
only witness at this hearing was Dr. James Groce, a physician at
Dorothea Dix Hospital who was qualified as an expert in forensic
psychiatry. Dr. Groce had examined defendant to determine his
mental capacity to stand trial. In his opinion defendant suffered
from "latent schizophrenia" and had "trouble controlling his
thoughts and emotions"; however, he considered defendant com-
petent to understand the nature and consequences of the pro-
ceedings against him, to assist his counsel and, therefore, to stand
trial. Judge Collier so found and the case proceeded.

Defendant was then arraigned and entered a plea of guilty to
first degree murder[5] which was accepted by the trial court.[6] A
jury of twelve and two alternates was selected and empaneled for
the purpose of determining, pursuant to G.S. 15A-2000, whether
defendant should be sentenced to death or life imprisonment.

The state's evidence on the sentencing phase tended to show
that Mabel Bowman Sherrill was found dead in the early after-
noon of 20 October 1977 near a lake in Caldwell County where she
had been fishing. An autopsy revealed two stab wounds in her
chest which, in the opinion of the forensic pathologist performing
the autopsy, caused death. "Ligature marks . . . typically pro-

---

5. Such a plea is expressly authorized by G.S. 15A-2001. Before the enactment of this statute defendant
would not have been permitted to enter a plea of guilty to a crime for which the punishment might be death.
*State v. Watkins*, 283 N.C. 17, 194 S.E. 2d 800, *cert. denied*, 414 U.S. 1000 (1973).

6. Before accepting the plea, the trial court questioned defendant under oath. Defendant stated that he
was not under the influence of any alcohol, drugs, medicine, pills or any other intoxicants, that he had discus-
sed his case fully with his attorney and was satisfied with his attorney's services, and that he understood that
he was pleading guilty to the felony of first degree murder. He said the charges had been explained to him; he
understood their nature; and he knew he could be imprisoned for life or sentenced to death on the basis of his
plea. He understood that he had the right to plead not guilty, be tried by a jury and confronted with witnesses
against him, but by his plea he relinquished these and other constitutional rights relating to trial by jury. He
stated that he was in fact guilty and that his plea of *guilty was not entered as a part of any plea bargain*. He
said further that his plea was entered on his own free will and understanding and that he had no questions
about it. He related that he was 26 years old and had completed the 11th grade. The trial court then con-
ducted an extensive hearing to determine whether there was a factual basis for the plea. At this hearing
testimony was offered, consisting essentially of defendant's confession and possession of the victim's .38 caliber
pistol. The trial court found there was a sufficient factual basis for the plea and, on the basis of this finding
and its earlier finding that the plea as made was "the informed choice of the defendant" and was made "freely,
voluntarily and understandingly," the court accepted the plea.

duced by a constricting band or ligature cord, applied with pressure around an area of skin, so as to compress the skin" were found around her neck. Cuts were found on her labia. There was, however, no evidence of internal trauma to her vagina; and upon examination of vaginal smears for spermatozoa, none was discovered.

A .38 caliber pistol was offered in evidence as State's Exhibit No. 2. It was identified by Mr. Bruce Sherrill as being a pistol which his wife had taken with her when she left to go fishing on the day of her death. This pistol was also identified by investigating officers as being that which they recovered from the possession of defendant's brother to whom defendant admitted he sold it. Other witnesses for the state also testified that they had observed a pistol similar to State's Exhibit No. 2 in defendant's possession.

The state relied primarily at the sentencing hearing upon defendant's confession made in the early morning hours of 1 November 1977 after he had been detained for questioning. According to investigators defendant stated to them that he had gone to the "Gunpowder Boat Access Area" sometime around 11:00 a.m. on 20 October 1977 to fish after having fished at three other locations in the area. He recognized Mrs. Sherrill whom he had seen there before. She was leaving the area, and he helped her put her boat motor in the back of her car. As she began to tie up her boat he came at her from behind, wrapped a fish stringer around her neck and began to strangle her. She apparently lost consciousness; and he pulled her up on the bank, tore open her blouse and fondled her breasts. Being unable to loosen her underclothing, he took out a knife with which he "cut the tip portion of the corset open and pulled back the panty hose and panties and cut those open. Then he raped her. He stated that he did not get an erection, but he did manage to penetrate slightly. He also stated that he did not have an orgasm . . . ." Realizing that she was not dead and being afraid that she would scream, he stabbed her in the heart with the knife.

Evidence for defendant at the sentencing hearing tended to show as follows: He was, according to investigators, "fully cooperative" with them. He had written a letter while in jail to Mrs. Ed Foster, the operator of Bethlehem Marina on Lake

Hickory, where defendant had purchased the fish stringer which he apparently used to strangle Mrs. Sherrill. The letter apologized "for any inconvenience or embarrassment which [Mrs. Foster] might have suffered" arising from his involvement in Mrs. Sherrill's death. Defendant had been active at Grace Baptist Church and, after the murder, expressed "sorrow, remorse and grief" to the pastor of that church. Defendant had a reputation for good character in his community. He was a dependable employee, thought of by his employer as honest, punctual, and hard working. His fellow workers considered him to be "a good fellow and a good worker" who "got along well with all of the others." They had never known him to harm, embarrass, be offensive or abusive to anyone. He was considered by a number of witnesses to be "an easy going, friendly normal individual." His jailer testified that, as a prisoner, he was "quiet . . . and never caused any trouble" and that he "was a model prisoner." He told the jail chaplain that he had attempted to write a letter to Mr. Sherrill apologizing for the death of Mrs. Sherrill "but could not put his words on paper."

Dr. Richard Proctor, who on order of the court had examined defendant, testified that he suffered from schizophrenia, "a disorder where there is an extremely strong genetic component, and it is the opinion of most experts that the disorder is the result of certain chemical changes that take place in the central nervous system or in the brain." Defendant's childhood showed a history of suicide attempts at ages 12, 14 "and again in the 11th Grade." As a child defendant had few friends, tended to "bottle up" his feelings, particularly his feelings of "hostility, anger, frustration." His siblings and his schoolmates made fun of him. In Dr. Proctor's opinion defendant was in the throes of a "mental or emotional disturbance at the time of the murder of Mabel Bowman Sherrill" and "the capacity of [defendant] to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired at the time he killed Mabel Bowman Sherrill." Dr. Proctor did feel, however, that defendant understood the position he was in and its legal consequences and that he knew the difference between right and wrong at the time of the incident "even though he was suffering from a mental defect or disease."

The state and defendant stipulated that defendant had no prior criminal record with the exception of one occasion where he received a ticket for fishing without a license.

After arguments of counsel the court instructed the jurors generally upon their duties and specifically with regard to the application of G.S. 15A-2000. The court submitted the following written "Issues and Recommendation as to Punishment," which issues and recommendation the jury ultimately returned as follows (Defendant's exceptions thereto are also noted.):

"1. Do you find beyond a reasonable doubt the presence of one or more — aggravating circumstances from the following list?

ANSWER: Yes.

Check those aggravating circumstances that you have found beyond a reasonable doubt:

__X__ The capital felony was committed while the defendant was engaged in the commission of, or attempt to commit, rape. Rape is forcible sexual intercourse with a woman against her will.

__X__ The capital felony was especially heinous, atrocious or cruel.

EXCEPTION NO. 33

2. Do you find that one or more of the following mitigating circumstances existed?

ANSWER: Yes

__X__ (a) The defendant has no significant history of prior criminal activity.

__X__ (b) The capital felony was committed while the defendant was under the influence of mental or emotional disturbance.

(c) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

State v. Johnson

(d) Any other circumstance arising from the evidence which the jury deems to have mitigating value.

EXCEPTION NOS. 34 and 38

3. Do you find that the mitigating circumstances are insufficient to outweigh the aggravating circumstances?

ANSWER: Yes

EXCEPTION NOS. 35 and 36

4. Do you find beyond a reasonable doubt that the aggravating circumstance or circumstances are sufficiently substantial to call for the imposition of the death penalty?

ANSWER: Yes"

Upon the jury's recommendation that defendant be sentenced to death, the court entered judgment accordingly.

II

In order to deal with defendant's contentions regarding the application to him of specific provisions of our death penalty statute it is necessary to consider it from the perspective of the legal history leading to its enactment. This is so notwithstanding that because of the result we reach we need not decide whether defendant could be constitutionally sentenced to death under our statute. *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979); *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). We must *construe* important provisions of the statute. The first maxim of statutory construction is to ascertain the intent of the legislature. To do this this Court should consider the statute as a whole, the spirit of the statute, the evils it was designed to remedy, and what the statute seeks to accomplish. *See generally In re Arthur*, 291 N.C. 640, 231 S.E. 2d 614 (1977); *State v. Hart*, 287 N.C. 76, 213 S.E. 2d 291 (1975); *Domestic Electric Service, Inc. v. Rocky Mount*, 20 N.C. App. 347, 201 S.E. 2d 508, *aff'd* 285 N.C. 135, 203 S.E. 2d 838 (1974). In the context of this statute, proper weight can be given these factors only after an understanding of the legal milieu in which it was enacted.

The legal history which ultimately gave birth to the statute began with *Furman v. Georgia*, 408 U.S. 238 (1972) in which five

State v. Johnson

justices of the United States Supreme Court concurred in a per curiam opinion holding that the imposition of the death penalty in cases arising from Georgia and Texas constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Each of the five majority justices wrote a separate concurring opinion, two (Justices Brennan and Marshall) on the ground that the death penalty was cruel and unusual *per se* and could not be carried out under any circumstances. The glue which seemed to hold two others (Justices Stewart and White) to the majority position was that the statutes under which petitioners were sentenced delegated "to judges or juries the decision as to those [capital] cases, if any, in which the penalty will be utilized" in such a way as to provide "no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not," *id.* at 311, 313 (White, J., concurring), thereby permitting "this unique penalty to be . . . wantonly and . . . freakishly imposed." *Id.* at 310 (Stewart, J., concurring). Justice Douglas felt that the statutes in question were "pregnant with discrimination." *Id.* at 257.

Four members of the Court later acknowledged in *Lockett v. Ohio*, 438 U.S. 586, 599-600 (1978):

> "Predictably, the variety of opinions supporting the judgment in *Furman* engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment. Some states responded to what was thought to be the command of *Furman* by adopting mandatory death penalties for a limited category of specific crimes thus eliminating all discretion from the sentencing process in capital cases. Other states attempted to continue the practice of individually assessing the culpability of each individual defendant convicted of a capital offense and, at the same time, to comply with *Furman*, by providing standards to guide the sentencing decision."

North Carolina followed the former course. A majority of this Court in *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973), interpreted *Furman* to mean not the abolition of capital punishment *per se* but rather the prohibition of its infliction "if either judge or jury is permitted to impose that sentence as a matter of discretion." *Id.* at 439, 194 S.E. 2d at 25. The majority in *Waddell* con-

cluded that our death penalty statutes, all of which contained a proviso that a jury by its recommendation could fix the punishment at life imprisonment[7] were severable. This Court read *Furman*, then, only to invalidate the discretionary provisos leaving death as the mandatory punishment for capital crimes in this state. On 8 April 1974 the legislature, by enactment of Chapter 1201 of 1973 Session Laws, rewrote G.S. 14-17 and G.S. 14-21 to make death the mandatory sentence for first degree murder and the newly created crime of first degree rape. By this same enactment it rewrote G.S. 14-52 and G.S. 14-58 to provide that life imprisonment would be the mandatory penalty for first degree burglary and arson, respectively. *See State v. Woodson*, 287 N.C. 578, 215 S.E. 2d 607 (1975). *Woodson* was the first case reaching this Court in which a defendant was sentenced to death under the new death penalty enactment. We unanimously affirmed both the convictions and the sentences of death imposed in that case.

The *Woodson* case reached the United States Supreme Court at about the same time as capital cases arising from Georgia, Florida, Texas and Louisiana. Decision in all cases was rendered on 2 July 1976. The mandatory death penalty statutes in North Carolina, *Woodson v. North Carolina*, 428 U.S. 280, and Louisiana, *Roberts v. Louisiana*, 428 U.S. 325, were nullified as being violative of the prohibition against cruel and unusual punishment under the Eighth and Fourteenth Amendments. Death sentences imposed under the statutes of Georgia, *Gregg v. Georgia*, 428 U.S. 153, Florida, *Proffitt v. Florida*, 428 U.S. 242, and Texas, *Jurek v. Texas*, 428 U.S. 262, were sustained. This quintet of cases, *Gregg*, *Proffitt*, *Jurek*, *Woodson*, and *Roberts*, made clear that neither unbridled, unguided discretion nor the absence of all discretion in the imposition of the death penalty is constitutionally permissible. The plurality opinion in *Woodson* stated that North Carolina had failed "to provide a constitutionally tolerable response to *Furman's* rejection of unbridled jury discretion in the imposition of capital sentences" and that North Carolina had failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." 428 U.S. at 302-03.

---

7. G.S. 14-17 (Murder); G.S. 14-21 (Rape); G.S. 14-52 (Burglary); G.S. 14-58 (Arson) (1B N.C. Gen. Stat., 1969 Replacement Volume).

State v. Johnson

*Furman* was read in the controlling opinions of these cases as mandating "that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia, supra,* 428 U.S. at 189. The statutes of Georgia, Florida, and Texas were found to provide both this necessary direction and sufficient limitation on the sentencing authorities' discretion in death cases.

In *Gregg, Proffitt* and *Jurek* petitioners argued that the standards designed to guide the sentencer were so vague, overbroad, and inconclusive as to permit, in practice if not in theory, the same kind of unbridled discretion found impermissible in *Furman.* Petitioners argued that the legislation was "no more than cosmetic in nature and [had] in fact not eliminated the arbitrariness and caprice of the system" condemned in *Furman. Jurek v. Texas, supra,* 428 U.S. at 274. The Supreme Court, in meeting this argument and sustaining the challenged statutes, relied heavily on several factors. One was that the state courts from which the cases arose had, themselves, carefully considered and construed specific provisions so as to bring the statutes within constitutional ambit.[8] Secondly, the Supreme Court stressed the importance of careful jury instructions when the jury is the sentencing authority.[9] Finally, the Supreme Court placed

---

8. Texas, for example, had construed certain of its statutory provisions, not otherwise clear on the point, to permit a defendant to bring to the jury's attention mitigating circumstances. *Jurek v. Texas, supra,* 428 U.S. at 272. Without this construction Texas' statute would have been found constitutionally wanting. *See Lockett v Ohio,* 438 U.S. 586 (1978). Florida had construed one of the aggravating circumstances, *i.e.,* that the murder was "especially heinous, atrocious, or cruel" so as to make this phrase more than a catchall aggravating circumstance applicable to any murder. It narrowed the definition so that it applied only to "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Proffitt v. Florida, supra,* 428 U.S. at 255. This Court has adopted this construction in *State v Goodman, supra,* decided today.

9. The Court said in *Gregg v. Georgia, supra,* 428 U.S. at 192-93:

"But the provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury. Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given. *See* American Bar Association Project on Standards for Criminal Justice Sentencing Alternatives and Procedures, § 1.1(b), Commentary, pp 46-47 (Approved Draft 1968); President's Commission on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, Task Force Report: The Courts 26 (1967). To the extent that this problem is inherent in jury sentencing, it may not be totally correctible. It seems clear, however, that the problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the state, representing organized society, deems particularly relevant to the sentencing decision.

"The idea that a jury should be given guidance in its decision making is also hardly a novel proposition. Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be virtually unthinkable to allow any other course in a legal system that has traditionally operated by following prior precedence and fixed rules of law. (Citations omitted.) When erroneous instructions are given, retrial is often required. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations."

State v. Johnson

much emphasis on the "safeguard of meaningful appellate review." *Gregg v. Georgia, supra,* 428 U.S. at 195.[10]

Over a decade before *Furman* was decided, the drafters of the Model Penal Code,[11] working under the auspices of the American Law Institute, saw the difficulties in the then prevalent method of death penalty imposition — unbridled discretion in the sentencing authority to impose or not to impose death. They proposed in response a more finely tuned system for death penalty imposition in murder cases. MPC § 201.6, pp. 59-80 (Tent. Draft No. 9, 1959); MPC § 210.6, pp. 128-33. A comparison of current death penalty statutes in Georgia, Florida, and North Carolina with the MPC demonstate that all three states drew heavily on MPC § 210.6.[12] In broad outline this section provides: (1) A sentence of life imprisonment shall be imposed by the court if it is satisfied that certain factors exist. (2) If none of these factors exist, the question of sentence shall be left either to a court or jury, depending on who determined defendant's guilt, in a separate sentencing procedure. (3) The sentencer is directed to consider at the sentencing hearing any matter deemed "relevant . . . including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physicial condition and any of the aggravating or mitigating circumstances enumerated in Subsections (3) and (4) of this section." (4) The sentencer is directed not to impose or recommend death "unless it finds one of the aggravating circumstances enumerated in Section (3) and further finds that there are no mitigating circumstances sufficiently substantial to call for leniency."[13]

10. The Court noted that the Supreme Court of Georgia had taken its review responsibilities quite seriously citing a number of Georgia Supreme Court cases setting out standards to be followed by that Court in reviewing a death penalty and noting several cases in which the Court had set aside death penalties in favor of life imprisonment. *Gregg v. Georiga, supra,* 428 U.S. at 204-06. It is also noted that the Florida Supreme Court had vacated eight of the twenty-one death sentences that it had reviewed. *Proffitt v. Florida, supra,* 428 U.S. at 253.

11. The Model Penal Code is hereinafter cited as "MPC." All references, unless otherwise indicated are to the Proposed Official Draft published in 1962. This draft was adopted, with minor revision, at the 39th Annual Meeting of the American Law Institute. *See* Proceedings, 39th Annual Meeting, The American Law Institute 120-34, 226-27 (1962).

12. *See* G.S. 15A-2000; Fla. Stat. Ann. § 921.141; Ga. Code Ann. § 27-2534.1.

13. The aggravating and mitigating circumstances listed in § 210.6(3) and (4) are as follows:

"(3) *Aggravating Circumstances.*

(a) The murder was committed by a convict under sentence of imprisonment.

(b) The defendant was previously convicted of another murder or of a felony involving the use or threat of violence to the person.

State v. Johnson

The MPC's proposals were based on unusually prescient observations of the Reporter as noted in the Comments to MPC § 201.6 (Tent. Draft No. 9, 1959). The notion that various kinds of specified murders should be automatically punished by death was rejected, saying, *id.* at 68:

"The reason is that we are thoroughly convinced that neither premeditation and deliberation nor the fact that the homicide occurred in the commission of a felony included in the typical enumeration provide criteria which include all homicides that arguably should be dealt with by the highest sanction or exclude all homicides that should not be. The delimitation therefore is unsatisfactory. It is at once too narrow and too broad.

"It is too broad, as we have said, insofar as felony-murder includes unintentional homicides caused by conduct which creates small risk of fatal injury or which are even truly accidental. We do not think there is a case for a death sentence unless a homicide has been committed purposely or

(c) At the time murder was committed the defendant also committed another murder.

(d) The defendant knowingly created a great risk of death to many persons.

(e) The murder was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, rape or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

(f) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.

(g) The murder was committed for pecuniary gain.

(h) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

(4) *Mitigating Circumstances.*

(a) The defendant has no significant history of prior criminal activity.

(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(c) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(d) The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.

(e) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

(f) The defendant acted under duress or under the domination of another person.

(g) *At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.*

(h) The youth of the defendant at the time of the crime." (Emphasis supplied.)

State v. Johnson

knowingly or with recklessness so great as to manifest extreme or callous indifference to the value of human life. On the other hand, the present delimitation is, in our view, too narrow insofar as it excludes cases of wholly wanton recklessness not involving an enumerated felony, such as derailing of a train without purpose to kill; cases of homicide on momentary impulse without any reasonable cause, which may manifest exceptional depravity; and cases where the aggravation inheres mainly in the actor's background or situation, as when he is a convict or has a record of resort to violence."

The drafters of the MPC "reflected a strong sentiment in favor of tighter controls on the discretionary judgment [and called for] proof of at least one of the enumerated aggravations to justify capital sentence." *Id.* at 71. Finally the MPC proposed that the aggravating and mitigating circumstances be weighed against each other.[14]

Against this legal background the North Carolina General Assembly enacted our present death penalty statute which we are, for the first time, considering in this and the other capital cases decided today. The North Carolina statute follows both in broad outline and in detail the MPC even more closely than did the statutes of Georgia and Florida.[15] This is appropriate inasmuch as the concerns to which the MPC was addressed were the same as those considered controlling in the leading opinions

---

14. The Comments include these statements, *id.* at 71-72:

"[W]e agree, however, with the Royal Commission on Capital Punishment that 'there are not in fact two classes of murder but an infinite variety of offenses which shade off by degrees from the most atrocious to the most excusable' and that 'the factors which determine whether the sentence of death is the appropriate penalty in particular cases are too complex to be compressed within the limits of a simple formula. . . .' (Citation omitted.) We think, however, that it is within the realm of possibility to point to the main circumstances of aggravation and mitigation that should be weighed *and weighed against each other* when they are presented in a concrete case. Such circumstances are enumerated in Subsection (1)(e) and Subsections (3) and (4).

. . . .

"[W]hat is rationally necessary is, as we have said, the balancing of any aggravations against any mitigations that appear. The object sought is better attained, in our view, by requiring a finding that an aggravating circumstance has been established *and* a finding that there are no substantial mitigating circumstances." (Emphasis original.)

15. The North Carolina legislature did not, however, follow MPC § 210.6(1) providing, in part, that if certain mitigating factors existed, *e.g.*, the young age of the defendant, the death penalty could not be imposed.

State v. Johnson

of the United States Supreme Court in the cases discussed above.[16.]

In summary, there are a number of controlling factors governing the interpretation of our death penalty statute. Unbridled discretion in the imposition of the sentence is not permitted. On the other hand, sentencing juries must have some discretion to determine in a rational and consistent manner those cases in which the death penalty should be imposed. Juries are to be guided in this process by a carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused. Thorough jury instructions, which incorporate and reflect the definitions accorded to these criteria and which are fully applied to the facts of each case, must be given. In each case the process must be directed toward the jury's having a full understanding of both the relevant aggravating and mitigating factors and the necessity of balancing them against each other in determining whether to impose the death penalty. Lastly, any imposition of the death penalty by the jury should be searchingly reviewed by the appellate courts to insure the absence of unfairness, arbitrariness or caprice in the result.

With this legal background in mind, then, we proceed to examine defendant's contentions regarding the application of specific provisions of our death penalty statute in this case.

## III

[1] Defendant contends the trial court failed adequately to define the mitigating circumstance set out in G.S. 15A-2000(f)(6).[17] As to this circumstance the jury was told:

---

16. Indeed the plurality opinion in *Gregg* expressly endorsed the MPC approach, saying:

"While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate, the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded 'that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed *and weighed against each other* when they are presented in a concrete case.' ALI, Model Penal Code § 201.6, Comment 3, p 71 (Tent Draft No. 9, 1959) (emphasis in original). While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner." 428 U.S. at 193-94.

17. *See* note 1, *supra.*

"The third mitigating circumstance listed is: The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. That means his capacity to recognize what he was doing was a criminal act or his capacity to follow the law was lessened by reason of an impairment of his capacity in those respects."[18]

Defendant argues, with some force, that this instruction is tantamount to telling the jury that defendant's capacity was impaired if the jury found his capacity was impaired. We agree that in the context of the evidence and defendant's contentions based thereon, this instruction was prejudicially inadequate.

General Statute 15A-2000(f)(6) is copied largely from MPC § 210.6(4)(g),[19] which rests in turn on MPC § 4.02(2) which provides:

"Whenever the jury or the Court is authorized to determine or to recommend whether or not the defendant shall be sentenced to death or imprisonment upon conviction, evidence that the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect is admissible in favor of sentence of imprisonment."

Section 4.02(2) has its basis in MPC § 4.01, which states:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

While MPC §§ 210.6(4)(g) and 4.02(2) are versions of a mitigating circumstance in a capital case, § 4.01 represents the MPC's

---

18. Later in his instructions the trial judge called the jury's attention to the testimony of Dr. Proctor and his diagnosis of schizophrenia as bearing on this mitigating factor, but he never defined the terms used in the statute beyond that given in the text.

19. *See* note 13, *supra.*

recommendation for a definition of legal insanity constituting a complete defense to a charge of criminal conduct.[20]

The phrases "to appreciate the criminality of his conduct" and "to conform his conduct to the requirements of law" are identical in all MPC provisions and in the mitigating circumstances defined by our legislature in G.S. 15A-2000(f)(6). The difference between the MPC's test for legal insanity and its mitigating circumstance provisions is that in the former a defendant must lack "substantial capacity" whereas in the latter his capacity need only be "impaired." In this respect the mitigating circumstance in our statute is identical to the MPC. Our statute differs, however, from MPC § 210.6(4)(g) in that under it the impairment is not expressly limited to that caused by "a mental disease or defect or intoxication."

In both our statute and the MPC's mitigating provisions, a defendant's impaired capacity does not absolve him of guilt. It is, rather, a mitigating circumstance which does not control but is only to be considered on the question of punishment. As pointed out in the Comment to MPC § 4.02, it embodies the view that impaired capacity,

> "even though insufficient in degree to establish irresponsibility, should be regarded as a factor favorable to mitigation of capital punishment . . . . While the provision is advanced here as a supplement to relaxation of the responsibility criteria, it should be added that there is an even greater need for such basis of mitigation in any jurisdiction where the strict *M'Naghten* rule survives." MPC § 4.02, p. 193 (Tent. Draft No. 4, 1955).

The definition of legal insanity in MPC § 4.01 was advanced in response to criticisms of the traditional *M'Naghten* test.[21] The *M'Naghten* test as a definition of legal insanity continues to be the law in this state. It was first laid down in M'Naghten's Case, 10 Clark & Fin. 200, 210 [8 Eng. Reps. 718, 722] (1843). It is stated in our cases as follows: "[A]n accused is legally insane and exempt

---

20. As such it was recently adopted in California in *People v. Drew*, 149 Cal. Rptr. 275, 583 P. 2d 1318 (1978). A majority of the California Supreme Court noted that this test "has won widespread acceptance, having been adopted by every federal circuit except for the first circuit and by 15 states." Supporting citations appear in 149 Cal. Rptr. at 281, 583 P. 2d at 1324-25 nn. 9, 10.

21. *See* MPC § 4.01, Comments (Tent. Draft No. 4, 1955).

from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, or, if he does know this, incapable of distinguishing between right and wrong in relation to such act." *State v. Swink,* 229 N.C. 123, 125, 47 S.E. 2d 852, 853 (1948); *accord, State v. Potter,* 285 N.C. 238, 249, 204 S.E. 2d 649, 656-57 (1974), and cases therein cited. Under this test if a defendant, at the time of his conduct under investigation, *knows* the difference between right and wrong and that his conduct is wrong and *knows* the nature and quality of the act he committed, he is legally sane and criminally responsible.

The criticisms of this test addressed by the MPC are adequately summarized in the Comments to MPC § 4.01, *see* note 21, *supra,* and in *People v. Drew, supra* note 20, 149 Cal. Rptr. 275, 583 P. 2d 1318. First the *M'Naghten* test fails to recognize what was thought to be well-established in psychiatry — that a person may often know the nature and quality of his act and that it is wrong, yet because of a mental disease nevertheless be unable to refrain from committing it. As the California court pointed out in *People v. Drew, supra,* 149 Cal. Rptr. at 279, 583 P. 2d at 1322:

> "Current psychiatric opinion . . . holds that mental illness often leaves the individual's intellectual understanding relatively unimpaired, but so affects his emotions or reason that he is unable to prevent himself from committing the act. (Citation omitted.) '[I]nsanity does not only, or primarily, affect the cognitive or intellectual faculties, but affects the whole personality of the patient, including both the will and the emotions. An insane person may therefore often know the nature and quality of his act and that it is wrong and forbidden by law, and yet commit it as a result of the mental disease.' (Rep. Royal Com. on Capital Punishment, 1949-1953, p. 80)."

Second, the *M'Naghten* test rests on an "all or nothing" concept. A defendant either *knows* right from wrong in relation to the act committed in which case he is legally responsible, or he *does not,* in which case he is absolved from responsibility. The

State v. Johnson

test recognizes no degrees of incapacity. *People v. Drew, supra,* 149 Cal. Rptr. at 279, 583 P. 2d at 1322.[22]

The MPC attempts to meet these criticisms by avoiding the all or nothing approach of the *M'Naghten* test and referring instead to lack of "substantial capacity" rather than lack of all capacity. Second, it incorporates a volitional aspect, similar to but not the same as the irresistible impulse test, by providing that lack of "substantial capacity" of a defendant "to conform his conduct to the requirements of law" shall constitute legal insanity.[23] Finally, instead of relying on a defendant's "knowledge" of the moral quality of his act it uses the word "appreciate." Under this language even though a defendant may know that his act is wrong he may, nevertheless, lack substantial capacity to "appreciate" its wrongfulness or criminality. *See People v. Drew, supra,* 149 Cal. Rptr. at 282, 583 P. 2d at 1325. The word "appreciate" was obviously carefully chosen. Appreciate means "to judge or evaluate the worth, merit, quality, or significance of: comprehend with knowledge, judgment, and discrimination . . . to judge with heightened perception or understanding . . . to be fully sensible of . . . ." Webster's Third New International Dictionary 105 (1971).

Neither the North Carolina General Assembly nor this Court has chosen to depart from the *M'Naghten* test when the issue is whether legal insanity constitutes a complete defense in a

---

22. The Comments to MPC § 4.01 make the point as follows:

"One further problem must be faced. In addressing itself to impairment of the cognitive capacity, *M'Naghten* demands that impairment be complete: the actor must *not* know. So, too, the irresistible impulse criterion presupposes a complete impairment of capacity for self-control. The extremity of these conceptions is, we think, the point that poses largest difficulty to psychiatrists when called upon to aid in their administration. The schizophrenic, for example, is disoriented from reality; the disorientation is extreme; but it is rarely total. Most psychotics will respond to a command of someone in authority within the mental hospital; they thus have some capacity to conform to a norm. But this is very different from the question whether they have the capacity to conform to requirements that are not thus immediately symbolized by an attendant or policeman at the elbow. Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way. (Citation omitted.)

"We think this difficulty can and must be met. The law must recognize that when there is no black and white it must content itself with different shades of gray. The draft, accordingly, does not demand *complete* impairment of capacity. It asks instead for *substantial* impairment. This is all, we think, that candid witnesses, called on to infer the nature of the situation at a time that they did not observe, can ever confidently say, even when they know that a disorder was extreme." MPC § 4.01, p. 158 (Tent. Draft No. 4, 1955). (Emphasis original.)

23. In North Carolina, of course, the irresistible impulse doctrine, adopted in many states as an adjunct to the *M'Naghten* rule, has been rejected as a test for legal insanity absolving the defendant of all criminal responsibility. *State v. Wetmore,* 287 N.C. 344, 357, 215 S.E. 2d 51, 58-59 (1975); *State v. Humphrey,* 283 N.C. 570, 574, 196 S.E. 2d 516, 519 (1973).

criminal case. *Nothing we say here is intended to be our criticism of that test for this purpose; nor is it to be thought a suggestion that the test as a guage for legal insanity in criminal cases be modified.* The legislature, though, by enacting G.S. 15A-2000(f)(6) has determined to depart from the *M'Naghten* test and to adopt the MPC test for mental capacity as a mitigating circumstance to be considered on the question of punishment in capital cases. This mitigating circumstance may exist even if a defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to know the nature and quality of that act. It would exist even under these circumstances if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished).

In the context of the evidence and contentions in this case it was incumbent upon the trial judge to explain fully this mitigating circumstance to the jury. The only testimony at the sentencing hearing relative to defendant's mental disease was that given by Dr. Richard Proctor, although Dr. Groce, testifying at an earlier hearing, agreed with Dr. Proctor's diagnosis that defendant suffered from schizophrenia. Both doctors described it as "latent." The "latent" quality of the disease was described by Dr. Proctor as follows:

> "Schizophrenia once it appears may be episodic. . . . [T]here are many times when it is completely under control, but as an example, an individual who has diabetes can have their diabetic condition under control through the use of diet and insulin but they still have the diabetes . . . .

> "At this time, I would consider the defendant a latent schizophrenic. It does change—he does go from latent to active schizophrenic.

>    . . . .

> "The defendant's schizophrenia is difficult to grade. I would grade his schizophrenic disease as moderate. In his grade of schizophrenia, it would not be likely over the course of his lifetime for people that have known him real well to

State v. Johnson

have noticed episodes of bizarre or at least unusual behavior. There wouldn't be any inkling from people who knew him that he was suffering from this disease or had this problem."

Dr. Proctor expressed three crucial opinions. These were: (1) defendant was under the influence of a mental or emotional disturbance at the time of the murder; (2) defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law was impaired at that time; and (3) defendant knew then the difference between right and wrong even though he was suffering from a mental defect or disease.

Defendant conceded at trial through his plea of guilty that he was legally sane; and his counsel admitted on oral argument that he had no evidence of defendant's legal insanity as defined under the *M'Naghten* test. During oral argument the Court pursued this point at length. Defendant's counsel stated that had Dr. Proctor been of the opinion that defendant did not know the difference between right and wrong, a plea of not guilty, bottomed on an insanity defense, would have been tendered. Not, therefore, being able to rely on an insanity defense under the law of North Carolina in the guilt phase of the trial, defendant heavily relied upon the mitigating circumstance set out in G.S. 15A-2000(f)(6) to persuade the jury that he should be sentenced to life imprisonment rather than death. It is fair to say that this mitigating circumstance was almost "the whole case" so far as defendant was concerned on the question of punishment.

On this state of the record, then, the trial court's cryptic reference to this mitigating circumstance in the definitional portion of his instructions was prejudicially insufficient. Defendant was entitled to a fuller treatment of the issue. The trial court should have explained the difference between defendant's capacity to know right from wrong which defendant conceded he possessed, and the *impairment* of his capacity to appreciate the criminality of his conduct from which his evidence indicated and he contends he suffered. While defendant might have known that his conduct was wrong, he might not have been able to appreciate, *i.e.*, to fully comprehend, or be fully sensible, of its wrongfulness. Further while his capacity to so appreciate the wrongfulness of his conduct might not have been totally obliterated, it might have been impaired, *i.e.*, lessened or

diminished. The trial court should also have more carefully explained that even if there was no impairment of defendant's capacity to appreciate the criminality of his conduct, the jury should nevertheless find the existence of this mitigating factor if it believed that defendant's capacity to conform his conduct to the law, *i.e.*, his capacity to refrain from illegal conduct, was impaired. Again, this does not mean that defendant must wholly lack all capacity to conform. It means only that such capacity as he might otherwise have had in the absence of his mental defect is lessened or diminished because of the defect.

For failure of the trial court to so instruct the jury in the context of the evidence and contentions in this case defendant is entitled to a new hearing on the question of his sentence.

On this point this case is distinguishable from *State v. Goodman, supra,* 298 N.C. 1, 257 S.E. 2d 569. We there held the instruction explaining G.S. 15A-2000(f)(6) to be sufficient. *Goodman* involved alcoholic intoxication, a condition much better understood by the average layman than such a mental disease as schizophrenia, with which we are here concerned. The real question in *Goodman,* furthermore, was whether defendant's alcoholic intoxication had progressed to such an extent as even to impair his faculties. On this issue the instruction as given in *Goodman* was sufficient. The issue here is much more complex, and the inadequacy of the instruction given the jury is clearly prejudicial.

IV

A

Defendant contends the trial court erred in failing to submit various "other" mitigating circumstances *in writing.* G.S. 15A-2000(f) lists eight mitigating circumstances which might arise, but it specifically provides that consideration shall not be limited to these eight. Subsection (f)(9) authorizes the jury to consider "any other circumstance arising from the evidence which the jury deems to have mitigating value." In this case the trial court submitted a written list of mitigating circumstances which included only those expressly set out in the statute.[24] Included on the list

---

24. Submission in writing of possible mitigating factors was approved in *State v. Goodman, supra.* G.S. 15A-2000(c) *requires* that aggravating circumstances and other findings prerequisite to the imposition of the death penalty be in writing.

was the catchall, "any other circumstance . . . ." As to this the jury was instructed as follows:

"The legislature has not provided any further listing of what those circumstances may be, but leaves it to the jury to determine from the evidence whether you deem other circumstances to exist, which would have mitigating value. You might consider such things as his cooperation with the law enforcement officer; his full confession to this crime, to which he has entered this plea of guilty; his help in producing evidence to the State of this crime; the fact that he's been a model prisoner since shortly after he was incarcerated in this crime in late October or early November in 1977, are some things that you might consider as other mitigating circumstances in this case."

Defendant argues that at least these circumstances mentioned by the trial court should have been included on the written list submitted to the jury. Further defendant contends the trial judge erred in failing to mention defendant's good character as a mitigating circumstance. Much of defendant's evidence during the sentencing hearing was devoted to proving that defendant's character and reputation in his community was good. A number of character witnesses testified to this effect.

We held in *State v. Goodman, supra,* that an instruction which failed to include defendant's intoxication *per se* as a mitigating circumstance was nevertheless adequate in that it did not preclude the jury from considering it and "the court is not required to sift through the evidence and search out every possible circumstance which the jury might find to have mitigating value." 298 N.C. at 34, 257 S.E. 2d at 590. We note, in addition, that when a defendant pleads not guilty in a criminal case and offers evidence of his good character he is entitled to have the jury consider such evidence both as bearing upon his credibility as a witness, if he testifies in his own behalf, and as substantive evidence on the issue of guilt. *State v. Bridgers,* 233 N.C. 577, 64 S.E. 2d 867 (1951). Failure to so instruct the jury, however, will not be held for error unless the defendant specifically requests such an instruction. *State v. Burell,* 252 N.C. 115, 113 S.E. 2d 16 (1960).

[2] The trial court may have considered that the mitigating circumstance which refers to a defendant's lack of "significant

history of prior criminal activity"[25] encompassed defendant's contention regarding his good character. Such, of course, should not be the case. Good character imports more than simply the absence of criminal convictions.

> "[Good moral character] is something more than the absence of bad character. It is the good name which [a person] has acquired, or should have acquired, through association with his fellows. It means that he must have conducted himself as a man of upright character ordinarily would, should or does. Such character expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing, if it is right, and the resolve not to do the pleasant thing, if it is wrong." *In re Rogers*, 297 N.C. 48, 58, 253 S.E. 2d 912, 918 (1979), *quoting In re Applicants for License*, 191 N.C. 235, 238, 131 S.E. 661, 663 (1926).

[3] Frequently, however, there may be a number of things including good character, which a defendant contends the jury should consider in mitigation. In order to insure that the trial judge mentions these to the jury in his instructions the defendant must file a timely request. Otherwise failure of the court to mention any particular item as a possible mitigating factor will not be held for error so long as the trial judge instructs that the jury may consider any circumstance which it finds to have mitigating value pursuant to G.S. 15A-2000(f)(9). The trial court so instructed the jury in this case. That defendant here made no timely request that additional mitigating factors be submitted to the jury *in writing* is, likewise, a complete answer to the trial judge's failure to do so.

[4] If, however, a defendant makes a timely request for a listing in writing of possible mitigating circumstances, supported by the evidence, and if these circumstances are such that the jury could reasonably deem them to have mitigating value, we are of the opinion that the trial judge must put such circumstances on the written list.

The legislature did not intend to give those mitigating circumstances expressly mentioned in the statute primacy over

---

25. *See* G.S. 15A-2000(f)(1).

others which might be included in the "any other circumstance" provision. Such an intent, if it existed, might run afoul of *Lockett v. Ohio, supra,* 438 U.S. 586. In *Lockett* Ohio's death penalty statute was found unconstitutional under the Eighth and Fourteenth Amendments because the Ohio sentencing authority could consider only three mitigating factors and none other. The Supreme Court concluded, *id.* at 604-05, 608:

> "that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death . . . . The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in non-capital cases . . . . The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.

> "There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

>        . . . .

> "To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." (Emphasis original.)

A footnote to the quoted sections of *Lockett* provides, "Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's

character, prior record or the circumstances of his offense." *Id.* at 604 n. 12.

Under *Lockett* a legislature would be free to provide that the existence of certain mitigating factors would preclude the imposition of the death penalty, while the existence of others should simply be considered, but not as controlling, on the question.[26] A death penalty sentencing statute, however, which by its terms or the manner in which it is applied, puts some *mitigating circumstances in writing and leaves others to the jury's recollection* might be constitutionally impermissible under the reasoning of *Lockett.* For if the sentencing authority cannot be precluded from considering any relevant mitigating circumstance supported by the evidence neither should such circumstances be submitted to it in a manner which makes some seemingly less worthy of consideration than others.

Thus we are satisfied that our legislature intended that all mitigating circumstances, both those expressly mentioned in the statute and others which might be submitted under G.S. 15A-2000(f)(9), be on equal footing before the jury. If those which are expressly mentioned are submitted in writing, as we believe they should be, then any other relevant circumstance proffered by the defendant as having mitigating value which is supported by the evidence and which the jury may reasonably deem to have mitigating value must, upon defendant's timely request, also be submitted in writing.

Since, however, defendant made no specific request to include possible "other mitigating circumstances" on the written verdict form submitted to the jury[27] and, likewise, made no timely request to include defendant's good character as a mitigating circumstance, we find no error in the actions of the trial judge in failing to do these things.

## B

Defendant next contends the trial judge should have peremptorily instructed the jury to find that his capacity to appreciate

26. *See, e.g.,* MPC § 210.6(1), discussed in note 15 *supra.*

27. Defendant did timely request that *all* the jury instructions be put in writing and delivered to the jury for use in their deliberation. This request does not suffice as a request to list all mitigating factors on the written verdict form.

the criminality of his conduct or to conform his conduct to the requirements of law was impaired. "When all the evidence offered suffices, if true, to establish the controverted fact, the court may give a peremptory instruction—that is, if the jury find the facts to be as all the evidence tends to show, it will answer the inquiry in an indicated manner . . . . A peremptory instruction does not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility." *Chisolm v. Hall*, 255 N.C. 374, 376, 121 S.E. 2d 726, 728 (1961). A peremptory instruction may be given in favor of the party having the burden of proof on the issue. *Flintall v. Insurance Co.*, 259 N.C. 666, 131 S.E. 2d 312 (1963).

While our death penalty statute does not expressly allocate the burden of proof with regard to mitigating circumstances, this burden must be borne by either the state or the defendant. On every factual issue, one side or the other must have the burden of proof. The statute makes it clear that the state must bear the burden of proving aggravating circumstances beyond a reasonable doubt. G.S. 15A-2000(c)(1). The state must also prove beyond a reasonable doubt that the statutory aggravating circumstances found to exist are sufficiently substantial to call for the imposition of the death penalty and that the aggravating circumstances outweigh whatever mitigating circumstances the jury finds. G.S. 15A-2000(c)(2)(3); *State v. Goodman, supra,* 298 N.C. 1, 257 S.E. 2d 569; *State v. Cherry, supra,* 298 N.C. 86, 257 S.E. 2d 551.

It is the defendant in these cases who will be asserting the existence of mitigating circumstances and urging the jury to consider them. Logically the defendant should have the burden of persuading the jury that the mitigating circumstances upon which he relies do in fact exist. We recently held in *State v. Williams*, 295 N.C. 655, 249 S.E. 2d 709 (1978), that the defendant in a kidnapping case had the burden to persuade the jury by a preponderance of the evidence of the existence of mitigating factors listed in the kidnapping statute, G.S. 14-39. After careful review of the controlling authorities,[28] we concluded in *Williams* that it was not a violation of constitutional due process to place upon the defendant the burden of persuasion on factors which

28. *Patterson v. New York,* 432 U.S. 197 (1977); *Mullaney v. Wilbur,* 421 U.S. 684 (1975); *In re Winship,* 397 U.S. 358 (1970); *State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds sub nom, Hankerson v. North Carolina,* 432 U.S. 233 (1977).

mitigated his offense. Our reasoning in *Williams* is equally applicable here. Neither aggravating nor mitigating circumstances are elements of the crime of first degree murder. They are circumstances which the jury considers in determining the sentence to be imposed for that crime.[29]

[5]   We hold, therefore, that the burden of persuading the jury on the issue of the existence of any mitigating circumstance is upon the defendant and that the standard of proof is by a preponderance of the evidence. Where, however, all of the evidence in the case, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance.

[6]   Here the only expert witness to testify as to defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was Dr. Proctor. He stated that in his opinion defendant's capacity was impaired in both respects.

There was also, however, testimony before the jury from Mrs. Ed Foster. She saw defendant twice on 20 October 1977. That morning he bought some minnows and a fish stringer. He came back early in the afternoon and asked to use the bathroom to wash up. Afterwards he asked Mrs. Foster if he had lost a knife there. They looked for the knife and were unable to find it. Defendant then asked Mrs. Foster and her husband if he could leave a gun at the store, and her husband said no. Mrs. Foster described defendant's demeanor that day in the following terms:

> "Based on my observation of the defendant during the time I have known him, I would say that his speech and mannerisms on the 20th were normal. I would describe Dale as being . . . shy and just a quiet person."

Mrs. Foster's observations of and conversations with defendant on 20 October 1977 were roughly contemporaneous with the murder of Mrs. Sherrill. It was her opinion that he was acting normally at that time. Her description of his conduct tends to sup-

---

29. Ohio placed the burden of proving mitigating circumstances by a preponderance of the evidence on the defendant by clear implication in its death penalty statute. Ohio Rev. Code Annot. §§ 2929.03(E), 2929.04(B). This was noted by the United States Supreme Court in *Lockett v. Ohio, supra,* 438 U.S. at 607. It was not the subject of comment. The Ohio statute was found unconstitutional on other grounds as noted in text above.

port that conclusion. "Generally, lay witness testimony concerning a person's mental capacity and condition is admissible as long as the witness has had a reasonable opportunity to observe the person and form an opinion satisfactory to himself on this issue." *State v. Hedrick,* 289 N.C. 232, 237, 221 S.E. 2d 350, 354 (1976). Mrs. Foster's opinion that defendant was "normal" on 20 October 1977 satisfied all the requirements of this rule and was properly admitted. It was competent evidence for the jury to consider on the issue of impaired capacity.

Dr. Proctor's testimony would have supported a jury finding in defendant's favor on the impaired capacity mitigating circumstance. Mrs. Foster's testimony would have supported a contrary finding. A peremptory instruction is inappropriate when there is conflicting evidence on an issue. *Perry v. Trust Co.,* 226 N.C. 667, 40 S.E. 2d 116 (1946). The trial judge did not, therefore, err in failing to give one here.

[5] Furthermore, just as the trial judge should not on his own be required to sift the evidence for every possible mitigating circumstance which the jury might find, neither should he be required to determine on his own which mitigating circumstance is deserving of a peremptory instruction in defendant's favor. In order to be entitled to such an instruction defendant must timely request it. If so requested and if defendant is otherwise entitled to it, it will be error for the trial judge not to give it. Failure of defendant here to make a request for such an instruction is an additional reason for concluding that no error was committed by the trial judge in failing to give it.

V

Defendant contends the trial court erred in ruling that it could not approve a plea bargain whereby defendant would plead guilty to first degree murder and the state would recommend a life sentence. At the outset of the proceedings the state and defendant inquired whether Judge Collier would approve such a plea bargain. Judge Collier stated his opinion that he could not do so in a capital case because the statute did not provide for it. Thereafter, according to affidavits of Judge Collier and Mr. Donald E. Greene, District Attorney for the Twenty-Fifth Judicial District, "No further discussion occurred between the State and the defendant regarding plea bargaining" and no plea bargain was

entered into. Defendant stated at his arraignment that he had not entered his plea as a part of a plea bargain. It is not clear from the record whether it was contemplated that any recommendation the state might make pursuant to a plea bargain would be made to a jury at the sentencing hearing or to the court, which would then sentence defendant without the intervention of a jury.

A short answer to this contention is that no bargain was ever made or formally submitted to Judge Collier for his approval. To meet, however, defendant's contention that such a bargain might have been struck had Judge Collier not indicated in advance that he would not approve it, we choose to discuss the merits of the argument.

[7] The question raised is whether a defendant may plead guilty to first degree murder and by prearrangement with the state be sentenced to life imprisonment without the intervention of a jury. The answer is no. It is true that the statute does not expressly prohibit such an arrangement. We are satisfied, however, that the plain language of its provisions demonstrates the legislature never intended such a procedure to be available. G.S. 15A-2000(a)(1) provides: "Upon conviction or adjudication of guilt of a defendant of a capital felony, the court *shall* conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment." (Emphasis supplied.) The remaining portions of G.S. 15A-2000 describe the manner in which the "separate sentencing proceeding" shall be conducted. G.S. 15A-2001 provides: "Any person who has been indicted for an offense punishable by death may enter a plea of guilty at any time after his indictment, and the judge of the superior court having jurisdiction may sentence such person to life imprisonment or to death *pursuant to the procedures of G.S. 15A-2000.* Before sentencing the defendant, the presiding judge *shall* empanel a jury for the limited purpose of hearing evidence and determining a sentence recommendation as to the appropriate sentence pursuant to G.S. 15A-2000. The jury's sentence recommendation in cases where the defendant pleads guilty shall be determined under the same procedure of G.S. 15A-2000 applicable to defendants who have been tried and found guilty by a jury." (Emphasis supplied.)

[8]   We do not see how the legislature could have expressed in plainer language its intent that the question of sentence in a capital case be determined in the same manner whether a defendant pleads guilty to the capital offense or is found guilty by a jury. Neither does the statute permit the state to recommend to the jury during the sentencing hearing a sentence of life imprisonment when the state has evidence from which a jury could find at least one aggravating circumstance beyond a reasonable doubt. Again we rely on the MPC for help in so interpreting our statute. The MPC expressly recommends that in cases where "the defendant, with the consent of the prosecuting attorney and the approval of the Court, [pleads] guilty to [first degree] murder" the Court shall impose what in North Carolina would be life imprisonment. MPC § 210.6(1)(c). Our legislature chose not to include such a provision in our statute although it utilized many of the MPC's other suggestions.

Such a provision, moreover, might make the statute unconstitutional under *United States v. Jackson*, 390 U.S. 570 (1968). In *Jackson* the Court construed the Federal Kidnapping Act to permit the imposition of the death penalty only upon recommendation of the jury that determined defendant's guilt. A defendant who pled guilty could not, under any circumstances, be sentenced to death. The Court held that the death penalty could not be imposed under a statute such as this which imposed "an impermissible burden upon the exercise of a constitutional right," *id.* at 572, in that "the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous to seek a jury acquittal stands the risk that if the jury finds him guilty and does not wish to spare his life, he will die." *Id.* at 581. Mr. Justice Blackmun believed that the Ohio death penalty statute declared unconstitutional on other grounds in the Court's opinion in *Lockett v. Ohio, supra*, 438 U.S. 586, was also unconstitutional on *Jackson* grounds because an Ohio rule of criminal procedure permitted the sentencing court in its "full discretion to prevent imposition of a capital sentence 'in the interests of justice' *if* a defendant pleads guilty or no contest, but wholly lacks such discretion if the defendant goes to trial." *Id.* at 618 (Blackmun, J., concurring). (Emphasis original.)

[8]   In a case in which the state has no evidence of an aggravating circumstance we see nothing in the statute which

would prohibit the state from so announcing to the court and jury at the sentencing hearing. Such an announcement must be based on a genuine lack of evidence to support the submission to the jury of any of the aggravating circumstances listed in G.S. 15A-2000(e). Upon such an announcement being made and upon failure of the state to offer evidence of any aggravating circumstance the judge may proceed to pronounce a sentence of life imprisonment without the intervention of the jury. This is so because a jury cannot return a sentence of death unless it finds, among other things, beyond a reasonable doubt, the existence of at least one aggravating circumstance which is supported by the evidence. G.S. 15A-2000(c) & (d).

This construction is supported by the Comment to MPC § 201.6, p. 72 (Tent. Draft No. 9, 1959):

"Under Subsection (1)(a) the Court is directed to sentence for a first degree felony, without conducting any further proceeding, if it is satisfied that none of the aggravating circumstances was established by the evidence at the trial or will be established if a further proceeding on the issue of the death sentence should be initiated. Thus if no aggravating circumstance appears in the evidence and the prosecuting attorney does not propose to prove one in the subsequent proceeding, sentence of imprisonment will be imposed."

Here, there was evidence tending to show the existence of two aggravating factors, *i.e.*, that the murder occurred in the course of a rape or attempted rape and that the murder was especially heinous, atrocious and cruel. *See* G.S. 15A-2000(e)(5), (9); Parts VI & VII, *infra*. The issue whether the death penalty should be imposed was thus necessarily one for the jury. It was not error for the trial court to refuse to sanction the proposed plea negotiation.

## VI

Defendant contends the evidence does not support the jury's finding that the murder was especially heinous, atrocious or cruel and that, even if it did, the court's instructions on this point were prejudicially inadequate and that the court further erred in not giving an instruction as requested by defendant. The instructions on this aggravating circumstance to which defendant takes exception were:

"Now, to give you a further definition of some of the words contained in this second subparagraph on this issue, members of the jury, beginning with the word 'especially,' I would instruct you that 'especially' used in this context means extremely, that is, extremely heinous, atrocious or cruel. Heinous means hateful, odious or gravely reprehensible. Atrocious may be defined as being extremely or shockingly wicked or cruel. It is also sometimes a synonym for heinous. Cruel means disposed to inflict suffering or indifference to or taking pleasure in pain or distress of another or hardhearted or pitiless. For a killing to be especially heinous, atrocious or cruel, it must have been done without conscience and pitiless and unusually torturous to the victim."

We held in *State v. Goodman, supra,* 298 N.C. 1, 257 S.E. 2d 569, that the aggravating circumstance listed in G.S. 15A-2000(e)(9)[30] was not intended to be a " 'catchall' provision which can always be employed in cases where there is no evidence of other aggravating circumstances" and that "this subsection is [not] intended to apply to every homicide." We adopted in *Goodman* Florida's construction of a similar provision in its death penalty statute.[31] By interpreting its comparable section to be directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," *State v. Dickson,* 283 So. 2d 1, 9 (Fla. 1973), *cert. denied,* 416 U.S. 943 (1974), the Florida Supreme Court provided a construction which enabled the United States Supreme Court to hold that the provision, as construed, was not unconstitutionally vague or overbroad and gave sufficient "guidance to those charged with the duty of recommending or imposing sentences in capital cases." *Proffitt v. Florida, supra,* 428 U.S. at 256. The trial judge defined this aggravating circumstance precisely in accord with definitions approved by the Florida Supreme Court in *Dickson,* the United States Supreme Court in *Profitt,* and this Court in *Goodman.*

**[9]** Defendant did, however, specifically request, in connection with this aggravating circumstance, that the trial court instruct "that murder is not *per se* heinous, atrocious or cruel . . . ." We said in *Goodman:*

---

30. "The capital felony was especially heinous, atrocious, or cruel."

31. The Florida provision is: "The capital felony was especially heinous, atrocious, or cruel, manifesting exceptional depravity." Fla. Stat. Annot. § 921.141(3)(h).

"While we recogize that every murder is, at least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. By using the word 'especially' the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection." 298 N.C. at 24-25, 257 S.E. 2d at 585.

The trial court, in addition to its other instructions, should have told the jury that not every murder is necessarily especially heinous, atrocious, or cruel in the sense these words are used in the statute inasmuch as such an instruction was specifically requested and was a correct statement of the law. Since we are granting defendant a new sentencing hearing on other grounds, we need not determine whether this error, standing alone, would have warranted a new sentencing hearing.

[10]   We are satisfied that the submission of this aggravated circumstance was proper in light of evidence. It tended to show that defendant first tried to strangle his victim to death with a fish stringer. Upon rendering her unconscious he sexually molested her. Then, realizing she was not dead, he stabbed her to death. Defendant's actions could have been found by the jury to be "especially heinous, atrocious or cruel" within the meaning of the statute as we have construed it.

## VII

[11]   Defendant brings forward the contention that since his conviction of murder in the first degree was based on the theory of felony murder, *i.e.,* murder committed in the course of rape, the state should not be entitled to rely on the aggravating circumstance that the "capital felony was committed while the defendant was engaged . . . in the commission of . . . [a] rape," to support the imposition of the death penalty. *See* G.S. 15A-2000(e)(5). This argument is simply not supported by the record. Defendant entered a plea of guilty as charged to murder in the first degree on an indictment in the statutory form. *See* G.S. 15-144. After hearing testimony on the plea the trial court found as a fact beyond a reasonable doubt "that there is a factual basis for the plea entered in this case." Evidence adduced to provide a factual basis for the plea would have supported the plea on

the theory of premeditation and deliberation.[32] Since defendant pled guilty and there was evidence of premeditation and deliberation, we need not address the issue whether the state could rely solely on a separate felony as an essential element of the capital offense of first degree murder, so that without the separate felony there would be no capital offense, and then rely on that same felony as an aggravating circumstance under G.S. 15A-2000(e)(5).

## VIII

[12]  Finally defendant argues that the trial court erred in failing to allow his motion for an associate counsel to assist Mr. Groome. Mr. C. A. Horn was appointed to assist Mr. Groome but only for the purpose of selecting the jury. Because of the grave consequences inherent in any capital case the North Carolina State Bar has adopted amendments to its regulations relating to appointment of counsel for indigent defendants which address specifically the appointment of counsel in capital cases. These amendments were duly adopted by the Council of the North Carolina State Bar on 22 May 1978 and approved by the Chief Justice on 26 May 1978. They are found at 294 N.C. 750-51. The rules provide:

"Section 4.8. Notwithstanding any other provision of this Article or any plans or assigned counsel lists adopted by a district bar pursuant thereto, an indigent defendant charged with a capital offense shall be entitled to be represented by one counsel provided in appropriate cases in the discretion of the Court one additional assistant counsel at either the trial or appellate level, or both, may be appointed.

"Section 4.9. Notwithstanding any other provisions of this Article or any plans or assigned counsel lists adopted by a district bar pursuant thereto, no attorney shall be appointed

---

32. The evidence showed that defendant came at his victim from behind, strangled her until she was unconscious and then tried to sexually assault her. When she began to regain consciousness, he feared she might scream and stabbed her. The tests for premeditation and deliberation have been set out in our cases as follows:

"Premeditation means thought beforehand for some length of time, however short. (Citations omitted.)

"Deliberation does not require brooding or reflection for any appreciable length of time, but imports the execution of an intent to kill in a cool state of blood without legal provocation, and in furtherance of a fixed design." *State v. Britt*, 285 N.C. 256, 262, 204 S.E. 2d 817, 822 (1974).

Defendant's conduct here clearly satisfies both these tests.

to represent at the trial level any indigent defendant charged with a capital crime in a district which does not have a public defender:

(a) Who does not have a minimum of five years experience in the general practice of law, provided that the Court may in its discretion appoint as assistant counsel an attorney who has less experience.

(b) Who has not been found by the court appointing him to have a demonstrated proficiency in the field of criminal trial practice.

"For the purpose of this section the term general practice of law shall be deemed to include service as a prosecuting attorney in any District Attorney's office.

"Section 4.10. Notwithstanding any other provision of this Article or any plans or assigned counsel lists adopted by a district bar pursuant thereto, no attorney shall be appointed to represent at the appellate level any indigent defendant convicted of a capital crime in a district which does not have a public defender:

(a) Who does not have a minimum of five years experience in the general practice of law, provided, that the Court may in its discretion appoint as assistant counsel an attorney who has less experience.

(b) Who has not been found by the trial judge to have a demonstrated proficiency in the field of appellate practice.

"For the purpose of this section the term general practice of law shall be deemed to include service as a prosecuting attorney in any District Attorney's office.

"Unless good cause is shown an attorney representing the indigent defendant at the trial level shall represent him at the appellate level if the attorney is otherwise qualified under the provisions of this section."

These proceedings were conducted before the adoption of the foregoing rules which authorize the appointment of associate counsel. At that time this Court had indicated a preference that "only *one* competent attorney [be] appointed to represent" an in-

digent defendant even in a capital case. *State v. Hardy,* 293 N.C. 105, 131, 235 S.E. 2d 828, 844 (1977). (Emphasis original.) Defendant here entered a plea of guilty to the capital felony. The crucial trial proceedings, therefore, centered around the sentencing hearing itself. The record reveals that Mr. Groome conscientiously and ably represented this defendant. His diligence is revealed at the pretrial, trial, and appellate stages of this proceeding. Defendant has not shown that he was prejudiced by failure to appoint associate counsel to assist Mr. Groome throughout the proceedings. We find no error in the trial judge's handling of this motion.

For error in the sentencing phase of the trial, this case is remanded for a new sentencing hearing pursuant to G.S. 15A-2000(d)(3).

In the guilt determination phase of the trial — No error.

In the sentencing phase of the trial — New trial.

Justice BROCK did not participate in the consideration or decision of this case.

Justice HUSKINS, concurring.

I support the majority opinion in *Johnson, Goodman* and *Cherry.* At the same time, I join in the concurring opinion of Justice CARLTON which correctly, I think, analyzes the results reached in these three cases.

Justice CARLTON concurs for the reasons stated in his concurring opinion filed this date in *State v. Goodman,* 298 N.C. 1, 36, 257 S.E. 2d 569, 591 (1979).